Delores **DEVINES**, Antoinette **Stokes**, Sarita **Beason**, and Nick **Southerland**, individually and on behalf of all other persons similarly situated, Plaintiffs-Appellants,

v.

Henry W. **MAIER**, individually and in his official capacity as Mayor of the City of Milwaukee; Wallace Burkee, individually and in his official capacity as Director of the Community Development Agency; William Ryan Drew, individually and in his official capacity as Commissioner of the Department of City Development; Gerald Anderson, individually and in his official capacity as Department of City Development Relocation Officer; Leonard E. Sloane, individually and in his official capacity as Deputy Inspector of Buildings; the City of Milwaukee, a municipal corporation; and their agents, employees, successors in office, assistants, and all others acting in concert or cooperation with them or at their direction or under their control, Defendants-Appellees.

No. 80–2315.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1981.
Decided Nov. 23, 1981.

Louis J. Mestre, Lawrence G. Albrecht, Thomas P. Donegan, Legal Action of Wis., Inc., Milwaukee, Wis., for plaintiffs-appellants.

Patrick B. McDonnell, Milwaukee, Wis., for defendants-appellees.

Before FAIRCHILD, Chief Judge, PECK,* Senior Circuit Judge, and SPRECHER, Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

Plaintiffs in this class action are residents of Milwaukee who were required by the City to vacate their rented homes as a result of the City's enforcement of its housing code. Plaintiffs contend that they are entitled to compensation for their displacements from their residences pursuant to the just compensation clause of the Fifth Amendment to the United States Constitution; Wisconsin's eminent domain statute, *Wis.Stats.* § 32.19; and the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA), 42 U.S.C. § 4601 *et seq.*[1] Defendants are the City of Milwaukee and various of its public officials.

The material facts relative to defendants' alleged liability are not disputed. Under 42 U.S.C. § 5305(a)(3), Milwaukee received federal funding for an Intensive Code Enforcement Program (ICEP), designed to improve housing code enforcement in certain deteriorating neighborhoods in order to arrest the decline of those neighborhoods. Additionally, Milwaukee received federal funds under 42 U.S.C. § 5305(a)(11) for a Code Enforcement Relocation Program (CERP), designed to provide relocation payments and assistance to persons displaced by activities funded under 42 U.S.C. § 5301, *et seq.*, the Housing and Community Development Act

---

* Honorable John W. Peck, Senior Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

1. At trial the plaintiffs had also claimed rights to compensation under the Housing and Com-

munity Development Act of 1974, 42 U.S.C. § 5301 *et seq.*, but have not appealed from the district court's grant of summary judgment for the defendants on this claim.

of 1974. Due to certain restrictive eligibility requirements imposed by Milwaukee on CERP benefits, not all tenants displaced as a result of ICEP activities were entitled to CERP assistance. Plaintiffs are that class of tenants who were displaced by housing code enforcement activities, but who were denied relocation benefits.

According to Milwaukee's CERP Policy Statement, only those tenants who were required to vacate their residences because the City had ordered the buildings in which they lived razed and removed, pursuant to Wisconsin law, were eligible for relocation benefits. District court opinion, 494 F.Supp. 992, 994 (E.D.Wis.1980). However, under the City's housing code enforcement program, tenants were not ordered to vacate their homes only when their buildings were subject to a raze and remove order. Rather, the vast majority of the orders to vacate were the result of the city's determination that various dwellings were unfit for human habitation, but not so dilapidated as to require razing. Accordingly, the City denied relocation benefits to tenants displaced from these buildings. Defendants refer to the code violations leading only to vacation orders but not to raze and remove orders as "temporary" violations. However, as the district court noted, the practical effects on the tenants are the same whether they are displaced because of "temporary" code violations or because of violations so severe as to result in raze and removal orders. *Id.* In either case, the displaced tenants were required to find alternative housing and to undertake the burden of moving from their homes as a result of the City's action.

As the district court noted, it is important to state at this point that the plaintiffs have not challenged Milwaukee's CERP eligibility requirements on equal protection grounds. Rather, they assert substantive rights to compensation derived from the just compensation clause of the Fifth Amendment to the United States Constitution and rights to compensation based on federal and state laws. These claims will be dealt with separately.

## THE JUST COMPENSATION CLAUSE

The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, provides, "[N]or shall private property be taken for public use, without just compensation." Plaintiffs contend that their leasehold interests were private property that was taken by the City of Milwaukee for a public purpose when the City acted to enforce its housing code by evicting plaintiffs from their homes.

As the district court stated, leasehold interests are property interests protected by the Fifth Amendment. *See e. g., Alamo Land & Cattle Co., Inc. v. Arizona,* 424 U.S. 295, 303, 96 S.Ct. 910, 916, 47 L.Ed.2d 1 (1976); *United States v. Petty Motor Co.,* 327 U.S. 818, 66 S.Ct. 813, 90 L.Ed. 1040 (1946). Furthermore, as the district court also noted, the fact that the city did not acquire the tenants' leaseholds, but rather exercised a police power to regulate the tenants' enjoyment of their leaseholds, is not dispositive. It is well established that a Fifth Amendment "taking" can occur through the exercise of the police power to regulate property rights. *E. g., Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 174, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979); *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979). In order for a regulatory taking that requires just compensation to occur, the exercise of a police power must both benefit the public and result in the destruction of the use and enjoyment of a legitimate private property right. *Kaiser Aetna, supra,* at 178–80, 100 S.Ct. at 392–93. *United States v. Dickinson,* 331 U.S. 745, 750–51, 67 S.Ct. 1382, 1385–86, 91 L.Ed. 1789 (1947). To a great extent, whether or not a regulation of private property rights for a public purpose constitutes a taking depends on the extent of interference with the private right. When the "regulation goes too far, it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). *See*

*also, Kaiser Aetna, supra; Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

To the inquiry whether the City's enforcement of its housing regulations interfered with plaintiffs' legitimate property interests, the extent of any such interference, and whether the regulations advanced a public purpose, the district court added the question whether the regulation was intended to effectuate takings of private property. Deciding that,

Housing code enforcement is a valid and important exercise of the municipal police power ... not designed to appropriate property for public use at private expense [citation omitted], but rather ... designed to prevent the injury and disease which are so often the by-products of substandard housing,

494 F.Supp. at 995, the district court concluded that no Fifth Amendment taking requiring just compensation occurred. The district court also considered it significant that there has never been a case holding that owners of buildings vacated or razed due to building code violations are entitled to just compensation, and concluded that there is no distinction of constitutional significance between landlords and tenants under such circumstances. *Id.*

■ We conclude that the district court erred in deciding that because the housing code was not intended to appropriate private property no regulatory taking occurred. "[T]he Constitution measures a taking of property not by what a State says, or by what it intends, but by what it *does.*" *Hughes v. Washington*, 389 U.S. 290, 298, 88 S.Ct. 438, 443, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring) (emphasis in original); *see, Davis v. Newton Coal Co.*, 267 U.S. 292, 301, 45 S.Ct. 305, 306, 69 L.Ed. 617 (1925). Public takings of private property may occur as the result of regulations intended only to promote public health, safety or morals. *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting and expressing the view of at least five members of the Court as to the merits).

■ In our view, the district court also erred to the extent that its conclusion was reached by equating the property interests of landlords and the plaintiff tenants. The determination whether a regulation effectuates a taking of private property requires an examination of the extent to which the regulation interferes with the owner's property interests. Because the rights of landlords and the rights of tenants are different rights, the effect of a regulation on those rights must be separately considered. Whereas enforcement of housing codes or zoning laws to prohibit human habitation may leave the owner with significant residual property rights so that the owner's rights may not be so interfered with as to be "taken" from him, *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Amdur v. City of Chicago*, 638 F.2d 37 (7th Cir. 1980), the tenant whose right to occupy the premises is extinguished has nothing left and the impact of the regulation on his rights could not be more severe.

■ Having concluded that the district court's analysis of the plaintiffs' constitutional claim was erroneous, we must now determine whether, as a matter of law, summary judgment for the defendants on plaintiffs' constitutional claim was nonetheless correct under the appropriate analysis. The district court assumed that the plaintiffs' leasehold interests were property interests subject to Fifth Amendment protection and that the City's orders to vacate effectively destroyed the value of those rights. 494 F.Supp. at 995. Because the primary benefit to the tenants of their leaseholds was the right to occupy the property leased, it is indisputable that the effect of the orders to vacate was to so completely destroy the plaintiffs' property interests that regulatory takings must have occurred if the remaining requirements for such a taking also occurred.

■ On appeal, defendants contend that the plaintiffs enjoyed no legally cognizable

leasehold interests to occupy buildings that the Department of Building Inspection and Safety Engineering had determined to be uninhabitable. The defendants argue that because state law made continued occupancy of the buildings illegal, the plaintiffs had no legitimate rights to occupy the structures and thus that the orders to vacate did not interfere with any legal property interests of the plaintiffs.

■ Defendants' argument cannot be approved without obliterating the Fifth Amendment protection against regulatory takings that benefit the public at the expense of the individual. Every regulation of private property limits the use of that property by the owner and makes certain uses "illegal." It is the very fact that a regulation enacted for the public benefit may deny an individual a use of his property that he would otherwise enjoy that gives rise to the Fifth Amendment inquiry whether the regulation causes the individual to bear a burden that in fairness should be distributed among all those benefited. Thus, where a police power regulation validly makes illegal the continued exclusion of the public from previously private property, *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), or requires that private property be preserved as a parkland and makes illegal any development of the property, *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting), the Fifth Amendment requires that the owner be compensated. The state may not severely limit or otherwise destroy private property rights and escape the obligation of just compensation by the circular reasoning that the private right was invalidated by the regulation and therefore never existed.

■ The defendants seek to fortify the argument that the plaintiffs had no legal rights under state law to inhabit their homes through the contention that the existence of state laws and city ordinances prohibiting occupancy of "uninhabitable" buildings gave the plaintiffs notice that they could have no valid leasehold interests

in substandard housing. Thus, the defendants seek to distinguish this case from instances where a regulation effects a taking of an existing legitimate property interest by contending that the plaintiffs either never acquired any legal rights to occupy because the buildings were substandard before the plaintiffs became tenants, or that those rights were extinguished automatically at the moment the buildings failed to meet the housing code standards. The defendants in essence argue that the plaintiffs had no more rights to occupy their buildings before the orders to vacate were issued than would the manufacturer of illegal whiskey have the right to own a secret distillery, and that neither the destruction of the plaintiffs' occupancies nor the destruction of the illegal still interferes with legitimate property rights.

Defendants' argument presupposes that Wisconsin law and the Milwaukee housing code specifically define an "uninhabitable" building in a way that clearly makes occupancy of specific buildings illegal and requires no administrative or executive action or discretion to determine inhabitability. In the absence of such specificity, the statutes and codes alone cannot identify specific structures that are legally uninhabitable and thus not subject to leasehold rights.

In the present case, plaintiffs were ordered to vacate their homes on the authority either of *Wis.Stats.* § 66.05 or section 51–14 or section 12–4 of the Milwaukee Code of Ordinances. *Wis.Stats.* § 66.05(1)(a) states that municipal building inspectors *may* (a discretionary term) issue an order to raze and remove or to repair and make safe any

> building or part thereof ... which in its *judgment* is so old, dilapidated or has become so out of repair as to be dangerous, unsafe, unsanitary or otherwise unfit for human habitation, occupancy, or use. (Emphasis added.)

Section 66.05(2)(a) states that, upon determining that a building is unfit for human habitation, the building inspector has the duty to prohibit occupancy and shall post a placard on the premises containing the

words: "This Building Cannot Be Used For Human Habitation, Occupancy Or Use." The Milwaukee Code of Ordinances §§ 51–14(1) and (2) authorize the building inspector to condemn a building for human habitation when the inspector finds conditions that endanger the welfare of the occupants or the public. Milwaukee Code § 12–4(c) authorizes the building inspector to order the discontinuation of occupancy whenever a structure is in violation of any regulation of the code, and § 12(g) requires the inspector to post a vacation notice in such circumstances.

■ Clearly, the Wisconsin and Milwaukee laws which provide that some structures may be legally uninhabitable are not self-executing. Rather, these laws provide that the determination that a building is uninhabitable requires an administrative determination that involves the discretion of the building inspector. In *Posnanski v. Hood*, 46 Wis.2d 172, 174 N.W.2d 528 (1970), a tenant sought to assert as an affirmative defense to an action for rent alleged Milwaukee Housing Code violations which the tenant contended made the premises untenantable under city ordinance. The Wisconsin Supreme Court held that the tenant had no such affirmative defense because the housing code provisions in question contained phrases such as:

> "reasonably good state of repairs"; "clean and sanitary condition"; "adequately"; "reasonably good working conditions"; and other general terms which leave a great deal of discretion to those enforcing the code.

*Id.* at 532. The court concluded that these discretionary terms indicated the intention that the housing code be enforced by administrative order and that absent such orders tenants could not allege violations of the housing code as a defense to non-payment of rent.

The same reasoning must be applied in the present case to answer the question whether the plaintiffs enjoyed legitimate rights to occupy the premises that they had rented prior to any administrative determination that their dwellings were legally un-

fit for human habitation. Whether their homes were so dangerous, unsafe, or unsanitary as to require vacation for the protection of the occupants and the general welfare was a "judgment," *Wis.Stats.* § 66.-05(1)(a), to be made by the proper administrative authority. Unless and until such judgment was made and the appropriate procedural steps subsequently taken, the plaintiffs' homes were legally inhabitable under the laws of the State and the City.

We have thus far concluded that the plaintiffs enjoyed legal rights to occupy their rental dwellings until those rights were terminated by the enforcement of the housing code by the City. We have also noted that those rights were so completely destroyed by the City's action that a regulatory taking of plaintiffs' rights occurred. The remaining step in the analysis of the plaintiffs' Fifth Amendment claim requires the determination whether the regulatory takings that were effected by the enforcement of the housing code were for a public purpose and thus constituted public takings.

■ The defendants, at different points in their brief, argue both that enforcement of the housing code by issuing orders to vacate was for the benefit of the public and that it was not. In arguing that the plaintiffs suffered no loss as a result of being displaced from their homes, the defendants state that the plaintiffs were the only persons receiving any direct benefit from enforcement of the housing code. The defendants, with overt paternalism, argue that the plaintiffs (each of whom had presumably chosen to live in buildings of dubious quality because in their individual best judgments such was the best alternative within their means and available to them) were the primary beneficiaries of being ordered from their homes. In some cases plaintiffs were ordered to vacate "immediately," in other cases they were given 72 hours or seven days notice to leave. These orders were accompanied by threat of prosecution for failure to comply, a threat that in some instances was carried out. The City argues that any benefit to the community in general resulting from plaintiffs be-

ing forced out of their homes was an indirect by-product of the direct benefit to the tenants of being relieved of their substandard housing. In contrast, at another point in their brief, the defendants argue that the enforcement of building codes is the legitimate exercise of a police power to forbid uses of private property which effect public nuisances that cause a detriment to public health and safety.

Whether a police power regulation of private property that does not bear a substantial relation to public health, safety, morals, or the general welfare can be constitutionally exercised may be subject to question. In *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981), Justice Brennan, dissenting, expressed the view of five members of the court that, "Because police power regulations must be substantially related to the advancement of the public health, safety, morals, or general welfare, see *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926), it is axiomatic that the public receives a benefit while the offending regulation is in effect." *Id.* 450 U.S. at 656, 101 S.Ct. at 1306. However, a footnote to this statement refers to the possibility of a situation in which a police power regulation is not enacted in furtherance of the public health, safety, morals, or general welfare so that any "taking" effected by the regulation is not for a public use and therefore not compensable under the just compensation clause. *Id.* 450 U.S. at 656, 101 S.Ct. at 1306, n.23.[2] The defendants in the present case contend that we have this latter situation now before us.

Defendants' argument is refuted by the introductory statement of purpose made by the City of Milwaukee when its housing code was enacted.[3] In that statement the City declared that enactment of the housing code was essential to the public interest because:

Part 2. It is hereby found and declared that premises exist within the City of Milwaukee which are blighted because there exists thereon blighted buildings, or other structures, either occupied or unoccupied by human beings, and such buildings or other structures are blighted because faulty design or construction, or failure to keep them in a proper state of repair, or lack of proper sanitary facilities, or lack of adequate lighting or ventilation, or inability to properly heat, or improper management, or any combination of these factors has resulted in such buildings or structures becoming so deteriorated, so dilapidated, so neglected, so overcrowded with occupants, or so unsanitary as to jeopardize or be detrimental to the health, safety, morals, or welfare of the people of the city. It is hereby further found and declared that such blighted premises and such blighted buildings or other structures contribute to the development of, or increase in, disease, infant mortality, crime and juvenile delinquency; that conditions existing on such blighted premises are dangerous to the public health, safety, morals, and general welfare of the people, that conditions existing on such blighted premises necessitate excessive and disproportionate expenditure of crime prevention, fire protection, and other public services; that the conditions existing on blighted premises cause a drain upon public revenue and impair the efficient and economical exercise of governmental functions in such areas. It is hereby further found and declared that the elimination of blighted premises and the prevention of occurrence of blighted premises in the future is in the best interests of the citizens of this city, of the State of Wisconsin, and of the entire United States; and

2. Justice Brennan indicated that in this latter circumstance the property owner may have a damage cause of action under 42 U.S.C. § 1983 for a Fourteenth Amendment due process violation.

3. The Statement of Purpose of the City of Milwaukee's housing code was originally codified at § 75–2 of the Milwaukee Code of Ordinances and subsequently was repealed and codified throughout the present Chapter 51 of the Milwaukee Code of Ordinances.

that the accomplishment of this end will be fostered and encouraged by the enactment and enforcement of this ordinance. Clearly, the City of Milwaukee sought to enact and enforce a housing code because of the benefits that would accrue to the public. Furthermore, the State of Wisconsin has also recognized in various legislative enactments that the public is served by laws aimed at eliminating substandard urban housing. *E. g.,* Urban Redevelopment Act, *Wis.Stats.* § 66.405(2); Blight Elimination and Slum Clearance Act, *Wis.Stats.* § 66.-431(2); Urban Renewal Act, *Wis.Stats.* § 66.435(2).

There can be little question but that the public has legitimate interests in reducing the incidence of substandard urban housing. Of course, that goal is made difficult to achieve by the fact that some members of the community are unable to afford the cost of housing that is maintained to housing code standards. In combatting the problem, the City of Milwaukee had various options available to it. It might, for example, have sought to enforce its orders to repair directly against the owners of substandard structures. Milwaukee chose instead to evict the tenants of substandard housing from their homes. While it is entirely possible that the public purpose of improving the physical structures of decayed buildings may not be served by this action, there is a possibility that the City's action will cause some landlords to improve their properties so that they may once again receive rental income. However, even if the substandard structures vacated by order of the City remain vacant because improvements are economically unfeasible in light of the potential rental income, then the public's avowed interests in reducing unsanitary and overcrowded conditions that promote disease and crime and adversely affect public morals are still ostensibly served by the City's enforcement of its housing code through evictions.

█ We conclude that the City of Milwaukee terminated the leasehold rights of the plaintiffs to occupy their homes in order to promote public interests in safety, health,

morals, and the general welfare. In doing so, the City placed a disproportionately heavy burden on those individual members of the community who have little or no choice but to live in low cost, often substandard, housing. The fairness dictated by the Fifth Amendment requires that the economic burden borne by the plaintiffs for the benefit of the community be distributed among those benefited. We hold therefore that the plaintiffs are entitled by the Fifth Amendment to just compensation for the regulatory taking of their leasehold rights for a public purpose, and the judgment for defendants on plaintiffs' constitutional claim must be reversed and the case remanded for further proceedings on the question of what compensation is just.

## COMPENSATION UNDER Wis.Stats. § 32.19

The district court exercised pendent jurisdiction over the plaintiffs' claim for compensation under *Wis.Stats.* § 32.19. Citing *Howell Plaza, Inc. v. State Highway Commission,* 66 Wis.2d 720, 226 N.W.2d 185 (1975), the district court held that section 32.19, "is merely the legislative implementation of the just compensation requirement . . . which, as discussed above, is not applicable under these circumstances." 494 F.Supp. at 995.

█ On appeal, both plaintiffs and defendants agree that the district court was correct in its determination that section 32.-19 merely implements the just compensation requirement, and each reiterate their respective arguments concerning the question whether the City's orders to vacate constituted a taking of legitimate private property interests for public purposes. Thus our conclusion regarding the plaintiffs' Fifth Amendment claim is dispositive of the issue whether plaintiffs are entitled to compensation under *Wis.Stats.* § 32.19. Additionally, we note that the Wisconsin Supreme Court's interpretation of section 32.19 is consistent with our analysis of the just compensation clause. *See Maxey v. Redevelopment Authority of Racine,* 94 Wis.2d 375, 288 N.W.2d 794 (1980) (city

causing tenants to vacate property constituted a taking of tenant's leasehold interests); *Howell Plaza, Inc. v. State Highway Commission*, 92 Wis.2d 74, 284 N.W.2d 887 (1979) (constitutional taking consists of deprivation of substantially all beneficial use of private property and requires compensation under Chapter 32); *Just v. Marinette City*, 56 Wis.2d 7, 201 N.W.2d 761 (1972) (where a police power restriction of the use of private property is so great that landowner bears unfair burden for the benefit of the public, a constructive taking occurs though government does not acquire the property); *Riebs v. Milwaukee County Park Commission*, 252 Wis. 144, 31 N.W.2d 190 (1948) (just compensation required for value of month-to-month periodic tenancy). Therefore, we conclude that the district court erred in granting summary judgment to defendants on plaintiffs' claim for compensation under *Wis.Stats.* § 32.19.

## UNIFORM RELOCATION ACT BENEFITS

On appeal, plaintiffs contend that those members of the plaintiff class evicted from their homes as a result of the defendants' federally supported ICEP program are "displaced persons" entitled to the benefits of the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA), 42 U.S.C. § 4601 *et seq.* The protections of the Act are afforded to "displaced persons" as defined by § 4601(6):

> The term "displaced person" means any person who ... moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or part, or as a result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance.

Plaintiffs argue that the City "acquired" the property on which they had been living when it prohibited further residential use of the property and evicted them.

The district court concluded that the plaintiffs were not "displaced persons" under § 4601(6) because the City did not "acquire" the use of the buildings that it had determined were unfit for human habitation. The district court based this conclusion on its reading of a footnote in *Alexander v. United States Department of Housing and Urban Development*, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979). The district court stated that:

> While the [Supreme] Court did state that "acquisition" [under § 4601(6)] does not necessarily require that the government take title to the affected property, there is a requirement that the government take property for its own use.

494 F.Supp. at 996, *citing* 441 U.S. at 62, n.41, 99 S.Ct. at 1587, n.41. The district court concluded that this "use" requirement "clearly calls for physical occupancy or use by the acquiring agency." *Id.* Thus, the district court held that the City had not "acquired" the property from which the plaintiffs were forced to move because the City never physically occupied the buildings, but rather had only evicted the plaintiffs and closed the buildings to further occupancy.

Footnote 41 in *Alexander*, relied on by the district court, does not state that an agency must physically occupy property in order to "acquire" that property under § 4601(6). Rather, that footnote states that the focus of the inquiry regarding "acquisition" is whether an agency obtains "the eventual right to use" the property rather than the agency's method of obtaining that right. 441 U.S. at 62, n. 41, 99 S.Ct. at 1587, n. 41. As an example of "acquisition" without taking title, the footnote offers the Post Office Department's practice of obtaining long term leases of property. The Court noted that persons displaced from such property would be entitled to URA benefits because the Post Office had acquired the eventual right to use the property even though it had not acquired title. Thus, while the *Alexander* footnote defines "acquisition" in terms of the right to use,

neither that footnote nor anything else in *Alexander* defines "use"[4].

Thus, *Alexander* is not authority for the district court's conclusion that an "acquisition" sufficient to entitle the plaintiffs to URA benefits could not occur, in lieu of passage of title to the City, unless defendants physically occupied the property. Rather, *Alexander's* direction that an acquisition can occur when an agency obtains "the eventual right to use" leaves open the possibility that a police power regulation of private property in furtherance of a federally funded program may "use" the property for a government purpose, even though the government does not acquire title nor take actual possession.

However, the phrases "acquisition of real property," used in § 4601(6), and "right to use property," used by the Supreme Court in defining "acquisition," each carry the connotation of vesting affirmative property rights. This connotation is consistent with the Congressional intent of the URA "to provide better relocation assistance when property is acquired for federal programs, not to extend assistance beyond that limited context to all persons somehow displaced by government programs" (footnote omitted). 441 U.S. at 50, 99 S.Ct. at 1581. Significantly, the URA repealed § 310 of the Housing Act of 1964, 42 U.S.C. § 1465 (1970 ed.), that had extended benefits to persons displaced from urban renewal areas by code enforcement activities. This provision had been the exception to the general pattern of federal benefits being available only when public projects required that the government obtain private property. 441 U.S. at 50, n. 12, 99 S.Ct. at 1581 n. 12. Consequently, while a police power regulation that has the effect of granting affirmative property rights to the government may effect an acquisition of property or property rights sufficient to meet the requirements of § 4601(6), the enforcement of laws that are merely restrictive of individual rights do not constitute such an ac-quisition. We conclude, therefore, that defendants' enforcement of housing codes by evicting plaintiffs from structures determined by the building inspector to be unfit for human habitation did not constitute an acquisition under 42 U.S.C. § 4601(6), and that the plaintiffs are not "displaced persons" entitled to URA benefits.

For the reasons stated above the judgment of the district court granting summary judgment for the defendants on plaintiffs' claim for benefits under 42 U.S.C. § 4601 *et seq.* is AFFIRMED. The district court's judgment granting summary judgment for the defendants on plaintiffs' claims for just compensation under the Fifth Amendment to the United States Constitution and under *Wis.Stats.* § 32.19 is REVERSED, and the case is remanded for further proceedings. Each party is to bear its own costs of this appeal.

FAIRCHILD, Senior Circuit Judge, concurring.

I agree with the reasoning of the majority and write separately only to express the following points.

I

The applicable statutes leave the determination of habitability to the discretion, not closely circumscribed in terms of necessity for the public welfare, of those charged with their enforcement. (*See* majority opinion at 143–144.) That being so, an order to a tenant to vacate does constitute a taking, at least where the premises is not so clearly uninhabitable that no reasonable person could find otherwise. The latter, however, is an issue of fact that has to be left for determination by the factfinder. That is to say, there is a taking only insofar as there was room for the exercise of discretion. Where the evidence of uninhabitability is so overwhelming that no reasonable person could conclude to the contrary the mere adjudication of that status by the state does not require compensation.

4. In *Alexander* the Department of Housing and Urban Development had acquired actual title to the property in question as the result of fore-closures, consequently the "right to use" test of acquisition was not an issue.

## II

Although we have not yet arrived at the issue of damages, some expression of caution in that direction is appropriate. A discretionary determination of uninhabitability or other cause to vacate is a taking both of the interest of the owner of the premises (although only a partial taking) and of the tenant. A tenant from month to month has a right to occupy for the balance of the current month and for the succeeding month, subject to the payment of rent, and the same is true of a fixed term tenant for the period of his lease. Loss of such rights, as well as the costs of moving, of locating comparable quarters, and so forth would be quantifiable as damages. A tenant might also be able to demonstrate a value for the probability of being able to stay in the future, but that factor is not a certainty and also would be subject to the rental obligation. Further, the tenant may be entitled to recover something from the landlord, assuming some sort of breach on his part, and that recovery may have to be offset against what may be recovered from the governmental entities. The point is that although the tenant may be able to recover some damages for the taking, they may not amount to very much once all of the relevant considerations—including the obligation to pay rent, the speculative nature of continued tenancy, the availability of redress against the landlord, and the like—are taken into account. It only makes sense at this juncture to express this word of caution.