**Pablo BERRIOS, et al., Plaintiffs,**

v.

**The CITY OF LANCASTER, et al., Defendants.**

**Civ. A. No. 90–5252.**

United States District Court, E.D. Pennsylvania.

July 14, 1992.

---

Howard D. Miskey, Central Pennsylvania Legal Services, Lancaster, Pa., Louis M. Shucker, Reading, Pa., Peter Zurflieh, Central Pennsylvania Legal Services, Harrisburg, Pa., for defendants Pablo Berrios, Linda Allmond, Janie Good, Marion Good, Clair Wright, Edna Wright, Charles Green and Estelle Aponte.

Melvin H. Hess, Gibbel, Kraybill & Hess, Lancaster, Pa., for defendants City of Lancaster, Janice C. Stork, James Schelling and Paula Robinson.

## MEMORANDUM

TROUTMAN, Senior District Judge.

Plaintiffs were forced to vacate their rented housing after the defendants declared the properties unfit for human habitation. Plaintiffs now seek, in their current motion for summary judgment, to have the defendants compensate them for (1) the Fifth Amendment "taking" of their entire property interest, *i.e.*, the leasehold, and (2) relocation benefits as allowed under the Housing and Community Development Act of 1974 ("Development Act"), 42 U.S.C. § 5301 *et seq.* The essential issues are (a) whether plaintiffs' had an "investment backed expectation" in continued possession of an uninhabitable leasehold, and (b) whether plaintiffs are entitled to relocation benefits when the housing code enforcement activities of the defendants results in plaintiffs' displacement. For the reasons which follow, we conclude that plaintiffs

are not entitled to either "taking" compensation or relocation costs.

## I. BACKGROUND.

The facts are essentially undisputed. Since defendants have not seriously argued and pointed to facts to the contrary, we will accept plaintiffs' Statement of Facts (Doc. # 21) to the extent they address the issues and summarize therefrom.[1]

Plaintiffs are eight low income tenants who resided in the City of Lancaster. As part of its housing code enforcement program, the defendants inspected and eventually condemned the properties in which the plaintiffs lived. The salaries of the housing inspectors were paid, in full or in part, by federal funds, *i.e.*, Community Development Block Grants. The defendants interest in applying its code enforcement actions is to secure the public welfare, health and safety by seeking to eliminate blighted and uninhabitable housing, conditions which are adverse to the public well being. There is no question that the defendants activities in this area are legal and proper. The only question is whether any compensation is due because of the effects the defendants activities had on plaintiffs' property interests. A description of the details of each plaintiff's property housing interest follows.

*1. Pablo Berrios:* Berrios lived on the second floor above a garage, rented from Russell Bair under a written lease, from October 1989, until he and his family vacated about June 15, 1990. The lease agreement called for payment of $250 per month. On May 29, 1990, after an inspection of the property, the defendants issued a Notice of Violation of Housing Code and a Notice of Condemnation and advised both the owner and Berrios that the property was unfit for human habitation and that Berrios would have to vacate within seven days.

*2. Linda Almond:* Almond, her three children, grandson, brother and wife, lived in a two bedroom house under an oral lease with the landlord, Angellini and Groff, Inc., and her brother, from February 1990 until November 1990, when she was forced to move. The oral lease agreement called for payment of $75, and later $20, per week to her brother. After an inspection of the property, the defendants issued a Notice of Violation of Housing Code on July 20, 1989. Since the cited conditions were not corrected, the defendants issued a Notice of Condemnation on June 13, 1990, and informed the owner and Almond that the property was unfit for human habitation and that Almond would have to vacate within sixty days.

*3. Janie Good:* Janie Good and her son, and later her two daughters, lived in a house rented from Franklin Swift, who also lived in the house, under an oral lease, from November 1989 to December 1990. Under the agreement, Janie Good contributed to payment of the household bills. After an inspection, defendants issued a Notice of Violation of Housing Code on February 13, 1989. Since the cited conditions were not corrected, the defendants issued a Notice of Condemnation on June 13, 1990, and advised the owner and Janie Good that the property was unfit for human habitation and Janie Good would have to vacate within sixty days.

*4. Marion Good:* Marion Good, the mother of Janie Good, lived in the same property as her daughter under an oral lease and payment of $120 per month. She resided there from November 1989 until July 1990. Notices of Violation of Housing Code and of Condemnation were issued in the same manner as described as affecting Marion Good's daughter, Janie. Marion Good moved into the home of Clair and Edna Wright, which property was also subsequently condemned, forcing Marion Good to move a second time.

---

**1.** We here expressly decline, however, to accept the plaintiffs' statement of facts as "findings of facts" as requested by plaintiffs in their Brief in Support, at 2. We cannot limit our inquiry to the extent of plaintiffs' statement. To the extent defendants have not brought contrary facts to our attention, we of course accept plaintiffs' facts for the current motion. We note, however, that defendants have brought other facts to our attention, not disputed by plaintiffs, and so accept them equally.

*5. Clair Wright:* Wright lived in a house, along with her daughter, plaintiff Edna Wright, and two grandchildren, rented from William McMichael under a written lease, from Spring, 1989, until January 1991. The lease agreement called for payment of $75 per month. After an inspection of the property, the defendants issued a Notice of Violation of Housing Code on January 25, 1989. Since the cited conditions were not corrected, a Notice of Condemnation was issued on June 13, 1990, and the owner and Clair Wright were informed that the property was unfit for human habitation and Clair Wright would have to vacate within sixty days.

*6. Edna Wright:* Edna Wright rented the same house on the same terms as Clair Wright. The process leading to her vacating the premises is also the same.

*7. Charles Green:* Green lived in a house, rented from William McMichael under an oral agreement, from 1973 until October, 1990. Green made rental payments of $110 per month. After an inspection, the defendants issued a Notice of Violation of Housing Code on January 25, 1989. Since the cited conditions were not rectified, the defendants issued a Notice of Condemnation on June 13, 1990, and informed the owner and Charles Green that the property was unfit for human habitation and that Charles Green would have to vacate within sixty days.

*8. Estelle Aponte:* Aponte, her boyfriend, and her daughter, lived in a house, rented from William McMichael under an oral lease, from August 1989 until October 1990. The agreement called for payment of $185 per month. After an inspection, the defendants issued a Notice of Violation of Housing Code on July 20, 1989. Since the cited conditions were not corrected, the defendants issued a Notice of Condemnation on June 13, 1990, and advised the owner and Aponte that the property was unfit for human habitation and that Aponte would have to vacate within sixty days.

The reasons generally cited by the housing inspectors for the condemnation included, *inter alia,* rotting wood and rotting or missing floorboards, unsafe electrical wiring, no heating system, broken sewer lines, and no kitchen or bathroom plumbing and water and sewer hookups.[2] Clearly, the condition of the properties was uninhabitable, and the landlords, or slumlords, did not take any action to correct or alleviate this awful situation.

After being informed that they must vacate their leased properties, the plaintiffs attempted to secure new housing. Despite their efforts, adequate housing was not to be found due to their unfortunate financial condition. The defendants, meanwhile, placed the plaintiffs at the top of the waiting list for a Section 8 Certificate which provides housing assistance. With such help, the plaintiffs eventually obtained housing. During the entire process, however, from moving to looking for new housing to eventually securing new housing, the plaintiffs incurred certain losses, including, *inter alia,* the cost of renting moving trucks and/or hiring moving helpers, payment of new security deposits and failure to receive security deposits from their previous landlords, the cost of temporary housing, and re-establishment of cable television service.

## II. STANDARDS FOR SUMMARY JUDGMENT.

Summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In order to obtain a summary judgment, the proponent of the motion has the initial burden of identifying evidence, from the sources enumerated in Rule 56, which demonstrates the absence of a genuine issue of material fact. If the parties agree as to the essential facts, the Court must then be satisfied that the moving party is entitled to judgment as a matter of law. Obviously, it will avail the

---

**2.** For at least some of the properties, the notices also directed that the use of the outhouse must cease.

proponent of summary judgment nothing if the undisputed facts, considered in light of the legal standards applicable to the claim, do not support a judgment in its favor.

## III. DISCUSSION.

As a preliminary matter, we here discuss what claims plaintiffs' are asserting. In their complaint, plaintiffs have asserted claims for violation of the fifth amendment, the Development Act, the Uniform Relocation Act, 42 U.S.C. § 4601 *et seq.*, the Pennsylvania Constitution and the eminent domain code, and Fourteenth Amendment due process clause. In their motion for summary judgment, however, plaintiffs have re-structured their claims and have elected to pursue only "claims for relief based upon the just compensation clause of the Fifth Amendment to the U.S. Constitution and the [Development Act]." (Plaintiffs' Brief in Support (Doc. # 21), at 1.) We thus consider the other claims waived and will, of course, address only the two claims mentioned above.

### A. *Fifth Amendment Compensation.*

■ Under the Fifth Amendment, if the federal government takes private property for public use, it must pay "just compensation" to the property owner. Through the Fourteenth Amendment, this provision also applies to state governments. What constitutes a property interest is defined by state law. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A leasehold interest, that is the right to possession exclusive of all others, including the owner of the underlying fee, is a property interest under Pennsylvania law, as reflected in the case law generally, and defined and created by, among other things, the terms of the lease contract, *see e.g., Board of Regents*, 408 U.S. at 577–78, 92 S.Ct. at 2709–10, and the Pennsylvania Landlord and Tenant Act of 1951, 68 Pa. Stat.Ann. § 250.101 *et seq.* Any type of leasehold interest, whether it is a written or oral lease or a periodic tenancy "only affect[s] the amount of compensation due

in the individual situation." (Plaintiffs' Brief in Support, at 7.)

Government action may amount to a compensable taking of property "if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter", even if the government does not acquire title to or occupy the property. *U.S. v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945). When the government "takes" property in the exercise of its police power to protect or promote the public health, safety, or welfare, through regulation, as in this case, to determine if compensation is required, we analyze the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations". *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978). *See also, Lucas v. South Carolina Coastal Council*, —— U.S. ——, —— n. 8, 112 S.Ct. 2886, 2895 n. 8, 120 L.Ed.2d 798 (1992); *Yee v. City of Escondido*, —— U.S. ——, ——, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992) (this recent Supreme Court opinion does not apply to the current case since it addressed only the issue a taking by physical occupation).

For the instant motion, and without inquiry, we accept that the entire property interest of the individual plaintiffs was extinguished due to the defendants' regulatory efforts.[3] We further, and in a like manner, find that the loss was permanent. Our analysis will thus turn on whether plaintiffs had an investment backed expectation in continued possession of their leaseholds.

1. 30 Day "Investment" Periods.

■ With respect to those plaintiffs entitled to possession under an oral lease, the facts show they made, or were obligated to make, monthly payments. Absent a definite term, and none has been offered into evidence, such a lease is a month to month tenancy. (*See*, Restatement 2d Property § 1.6 and comments (d) and (f) thereto.) Those plaintiffs who are alleged to hold

---

**3.** In this respect, we have followed the recent Supreme Court opinion in *Lucas, supra.*

written leases,[4] the facts show, also made monthly payments. In addition, since there is no evidence to the contrary, we will assume that under all the leases, rent was paid in advance for the rental of the property for the next one month.[5] All the plaintiffs, except Pablo Berrios, were given notice to vacate within sixty days.

If rent is paid for the use and possession for the next 30 days, once the rent is paid, there is an investment backed expectation to remain in possession of the property for those 30 days. This is so even after notice to vacate within 60 days is given. After the notice to vacate within 60 days is given, and subsequently rent is paid for the next month, i.e., to cover the period between 30 and 60 days from the giving of the notice, there is likewise an reasonable investment backed expectation to remain in possession for that time as well. To the extent a person may pay rent beyond that 60 day window period in which the person is to vacate due to the condemnation of the property, however, there simply can be no expectation, investment backed or otherwise, of continued use and enjoyment subject to "taking" for which compensation must be given. It is not the property *per se* which has been taken in a regulatory taking, but the opportunity to utilize that property interest, a distinct interest for which the owner clearly paid and anticipated using without anticipating government interference. This case is thus distinguished from *Lucas*, —— U.S. at ——, 112 S.Ct. at 2900, since it does not involve a

regulation "newly legislated or decreed." In this case, government interference was without a doubt to be anticipated since plenty of warning, *i.e.*, sixty days notice, was given.[6]

Taking the essential facts as stated by the plaintiffs, there simply is no reasonable investment backed expectation to retain possession beyond those sixty days when the "investment" is paid for thirty day periods. Thus there has been no property interest taken which is subject to fifth amendment compensation. Plaintiffs cannot possibly state a claim for fifth amendment compensation.

### 2. Notice to Quit under Pennsylvania Law.

A different analysis upon which we could conclude that no fifth amendment compensable taking has occurred looks only to the reasonable expectations, regardless of any "investment". *Cf., Penn Central*, 438 U.S. at 124–25, 98 S.Ct. at 2659–60 ("this Court has dismissed "taking" challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests sufficiently bound up with the *reasonable* expectations of the claimant to constitute 'property' for Fifth Amendment purposes." (emphasis added)). Since 68 Pa.Stat.Ann. § 250.501 provides that a landlord must give a tenant no less than 30 days notice to quit when the lease is for an undetermined term,[7] by operation of this statute, it would be fair to say that a tenant can reasonably expect to retain possession for no more than thirty

---

**4.** Although plaintiffs' statement of facts claims some plaintiffs hold their property under a written lease, no evidence to support this assertion, which evidence would be in the control of plaintiffs, was offered.

**5.** While there is no evidence on this particular aspect of the lease, there is no prejudice to either party if we make this assumption. If, instead, we assumed that rent was paid at the end of the one month term, then there could be no "investment backed expectation" which the plaintiffs must show in order for us to find a taking; there would only be a debt owed which would be impossible for the defendants to "take". As for the defendants, we believe that they are not prejudiced by this assumption as our holding makes clear.

**6.** Since Pablo Berrios was given only seven days notice to vacate, the analysis for his case would be a different matter. Under our reasoning, we would require further factual information, such as when rental payments were due under the lease or when rent was in fact paid, because, for example, if rent was paid after the May 29 notice, there is no reasonable investment backed expectation and thus no compensable taking. We will not require further information, however, since there is no taking with respect to Pablo Berrios, as our additional analyses show.

**7.** As mentioned above, although plaintiffs have submitted a statement of facts they have not provided evidence regarding the duration of their leases, written or otherwise.

days after notice was given. In light of our discussion in the next section, this statute, and the fact that the defendants gave 60 days notice to vacate, and gave notice not as a landlord but as a municipal government exercising its police powers, the plaintiffs did not have a reasonable expectation to remain in possession beyond the notice period and no compensable taking has occurred.

### 3. Reasonable Expectation of Continued Occupation in an Uninhabitable Rental Home.

█ Analyzing only the reasonableness of an expectation of continued occupation of a place unfit for human habitation yields the same result. Plaintiffs at one point argue that the properties were not unfit for human habitation until a subjective act of government declared them so. (Plaintiffs' Brief in Support at 28–30; Plaintiffs' Reply Brief at 5 n. 1.) We do not agree, particularly on the facts of this case. Such a government declaration merely sets in motion the mechanism to condemn properties. The fact remains that the condition of the properties does not change upon such a declaration. The properties in issue did not have, *inter alia*, heat, sewer, kitchen or bath facilities prior to the Notices of Condemnation. These circumstances are so objectively violative of housing codes and community standards that there is no question that the properties are uninhabitable. *See e.g., Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897, 906 (1979) (declining to hold that a determination of breach of implied warranty is dependent on proof of housing code violations; and discussing cases defining habitability in terms of "contemporary community standards"; "lack of potable water supply to the home prevented its use as habitation").[8]

We cannot conclude, given the condition of the properties and all other facts of this case, the laws governing the condition of such properties, and the generally accepted standards of acceptable living conditions in this area, that there could be a reasonable expectation, "a legitimate claim of entitlement", *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, to continued possession of properties such as these.

We sympathize with the unfortunate financial plight under which plaintiffs find themselves and recognize that they may not easily find adequate housing let alone housing equipped with many of today's amenities. Further, we recognize that it may appear that plaintiffs could be caught in an unfortunate cycle of having to rent sub-standard, sub-code housing and thus continually face the threat of condemnation. We do note, however, that this is not the case here, as there are programs available to assist the plaintiffs in securing adequate and acceptable housing, and in fact, such a program actually was used to allow plaintiffs to find housing that otherwise would be beyond their financial means.

We also note that plaintiffs have certain self-help remedies under Pennsylvania law, remedies which might be more effective than looking to government, or risking dependance upon local bureaucrats, for help, such as, *inter alia*, repair and deduct, rent withholding, suits in equity and or law. *See e.g.*, 35 Pa.Stat.Ann. § 1700–1; *Pugh v. Holmes*, 405 A.2d at 907–908. While plaintiffs' would like to be characterized as blameless with all fault to be placed upon the landlord and even the defendants, *see*, Plaintiffs' Brief in Support at 27–28, plaintiffs themselves must take some responsibility for the condition of the properties, particularly if their interest in remaining

---

**8.** As discussed in Plaintiffs' Reply Brief (Doc. #23) at 7, *Pugh* allows a tenant to remain in possession of an uninhabitable property and abate rent. Implicit in *Pugh*, therefore, is the recognition that property may be in fact uninhabitable without prior government declaration. *See also, Devines v. Maier*, 665 F.2d 138, 148 (7th Cir.1981) (particularly the concurring opinion of Judge Fairchild: "Where the evidence of unihabitability is so overwhelming that no reasonable person could conclude to the contrary

the mere adjudication of that status by the state does not require compensation.") *appeal after remand, Devines v. Maier*, 728 F.2d 876 (7th Cir.1984) (en banc), *cert. denied*, 469 U.S. 836, 105 S.Ct. 130, 83 L.Ed.2d 71 (1984).

In addition, there is no evidence that plaintiffs' ever challenged the condition of their housing. If they had, according to *Pugh*, they might then have had under an expectation of continued possession pending decision on that challenge.

there is so strong. (*See e.g.*, Plaintiffs' Brief in Support, at 22.) 68 Pa.Stat.Ann. §§ 250.552–554 provides not only the landlord's duties and the tenant's rights, but also the tenant's duties which include, *inter alia*, observing all codes and regulations.[9]

### B. Development Act Relocation Expenses.

#### 1. Interpretation of the Development Act.

■ To decide this issue, we are required to construe the Housing and Community Development Act. The Development Act contains a mechanism to provide assistance to low and moderate income persons who are displaced as a result of a Development Act assisted project. In order to receive a Community Development Block Grant ("CDBG"), 42 U.S.C.A. § 5304(d) requires the potential CDBG recipient to certify that an anti-displacement and relocation assistance program is in effect. Section 5304(d)(2) provides that "[t]he residential antidisplacement and relocation assistance plan shall in connection with a development project assisted [with CDBG funds]

(A) in the event of such displacement, provide that—(iii) relocation benefits shall be provided for all low or moderate income persons who occupied housing demolished or converted to a use other than for low or moderate income housing...."

The City of Lancaster, a CDBG recipient, has certified and implemented an antidisplacement plan. Because CDBG funds were used to pay for the City of Lancaster's housing inspectors and related code enforcement activities, but no other CDBG funded activities with respect to the properties has occurred, the question we must decide is whether plaintiffs' displacement due to the defendants' code enforcement activities alone triggers relocation benefits.

The very language of this section conditions the payment of relocation benefits upon the displacement occurring in connection with a development project. Reference throughout the statute to "assisted activities" consisting of demolition, rehabilitation, or conversion of the properties to another use shows that a project is contemplated to be more than mere code enforcement. We conclude the statute does not require the payment of benefits when the displacement occurs solely as a result of code enforcement activities.

#### 2. Department of Housing and Urban Development Regulations.

In addition, there are extensive regulations and commentary issued by the Department of Housing and Urban Development ("HUD") implementing the Development Act. Since our interpretation of 42 U.S.C.A. § 5304(d) is the same as HUD's, and since the exact issue with which we are currently faced was raised by others in response to requests for public comment and is, therefore, addressed in the HUD commentary, we will allow ourselves to be guided by HUD's detailed and expert analysis of the issue.

On July 18, 1990, HUD published a final rule relating to relocation benefits and which amended, *inter alia*, 24 C.F.R. Part 570.496a. (55 Fed.Reg. 29296). This rule was intended to implement the revisions to § 104(d) of the Development Act, 42 U.S.C.A. § 5304(d), as contained in § 509 of the Housing and Community Development Act of 1987. (Pub.L. 100–242, Feb. 5, 1988). The preamble to the revised regulation, under the heading "II. Activities Subject to Section 104(d)", states that "[t]he most frequently asked question was whether the section 104(d) requirements were triggered by CDBG-funded code enforce-

---

**9.** Plaintiffs frequently refer to the fact that the defendants could have chosen alternative means rather than condemning the properties, such as pursuing the landlord. We note that defendants were not required to pursue any particular means but simply chose one of the means, and apparently the easiest, available. Plaintiffs likewise exercised similar discretion when they too chose not to pursue remedies available to them against the landlord but instead choose the easier route of ignoring their housing situation. While the coercive power of the defendants may be far greater than plaintiffs, if defendants do not use that power, plaintiffs should not ignore their own abilities. This is like saying "although I may be able to walk out of a burning building, I will wait for someone else to rescue me".

ment activities." This is the very issue which we must address.

Although the preamble stated that code enforcement activity is not covered under this rule, it went on to state

[W]here CDBG assistance is used solely to pay the administrative costs of code enforcement (such as payment of the salaries of code enforcement inspectors who condemn buildings), and the resulting demolition or rehabilitation is privately funded, the statute does not mandate coverage, since section 104(d)(2) requirements are limited to displacement "in connection with a development project assisted under section 106 or 119."

Although the properties at issue herein were not demolished or rehabilitated, but simply remain vacant by choice of the landowner, the net effect is the same. While the code enforcement efforts resulted in the condemnation of the properties, the choice of the landlord not to effect repairs is the functional equivalent of privately funded demolition or rehabilitation. Thus, code enforcement alone does not trigger § 5304(d) relocation benefits.[10]

Plaintiffs argue that the statute requires compensation when CDBG efforts lead to the conversion of low to moderate income housing to another use and stress that this, *i.e.*, conversion to another use, has occurred in the instant case. We reiterate, however, that there is no activity involving CDBG funds which led to a conversion in

the properties in the current case. At section "VII. Relocation Assistance Under Section 104(d)—General Provisions", the preamble to the final rule states that a person must be provided with relocation assistance when that person is displaced as a direct result of the conversion to another use "in connection with an activity assisted" with CDBG funds. The only CDBG assisted efforts involved were code enforcement. No CDBG funds have been expended in furtherance of any project, which under the statute is clearly contemplated as being demolition, rehabilitation or other affirmative renewal or change program. Further, despite this conclusion, no CDBG funds have been used to retain the properties in their current condition. There simply has been no use of CDBG money, beyond the code enforcement efforts, such that we could find that there is a CDBG assisted project which has converted the properties to a use other than low/moderate income housing. The property owners' decision not to effect any repairs, particularly when they are not CDBG recipients, is not a conversion to another use.[11]

## IV. DISMISSAL OF THIS ACTION.

Plaintiffs' moved for summary judgment; defendants, did not cross move or otherwise seek to dismiss this action but sought a trial of this matter. Upon review of our analysis, however, we determine

---

**10.** Further evidence of this is found in HUD's proposed rule of February 3, 1992 (57 Fed.Reg. 3971) wherein HUD proposed to amend the regulation to provide for relocation benefits whenever property is demolished or converted to another use, whether or not CDBG assisted, as a direct result from code enforcement. Even if this proposed rule were in effect, however, we still would reach the same conclusion since we find that the property has not been converted to another use.

**11.** We here note that, like our discussion in the preceding section, plaintiffs, in the future, can avail themselves of other fora to present their claims. First, the regulations provide that a person may appeal the local government's decision regarding the denial of relocation benefits or request review with the State. 24 C.F.R. § 570.496a(f).

Second, the preamble to the HUD rules revision clearly recognized the plight of persons like

plaintiffs. As discussed in footnote 9, *supra,* on February 3, 1992, HUD published such a proposed rule that would change the code enforcement provisions and has invited public comment thereon. (57 Fed.Reg. 3971). The preamble to the proposed rule discusses the same prior history cited above and then states

this proposed rule would treat CDBG-funded code enforcement activities that result in non-CDBG assisted demolition of housing or conversion ... in the same manner as when CDBG funds are used to pay the actual demolition or conversion....

Finally, HUD apparently is considering taking action to define the term "project". (57 Fed. Reg. 16804 (April 27, 1992)). The definition of this term could affect a determination whether a conversion to another use, as plaintiffs argue, has occurred in future cases similar to theirs.

that plaintiffs have failed to state a claim and we will dismiss their action.

Although we are not determining a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), we have essentially accepted plaintiffs' statement of the facts and have reviewed all the evidence most favorably towards the plaintiffs. Plaintiffs' have also, by filing their motion for summary judgment, asserted that no issue of material fact is in dispute. Thus, we conclude that, taking all the undisputed material facts as presented by plaintiffs, and our analysis of the pertinent law (which was also when possible, we feel, construed in a manner more favorable towards plaintiffs) plaintiffs' have failed to state a claim. In the interests of economy and efficiency, the court and the parties should not be further burdened with this case and hence we will dismiss the action.

## V. CONCLUSION.

Based upon the foregoing reasons, we conclude that plaintiffs' motion for summary judgment will be denied. Further, we find that this case should be dismissed. Hence, an appropriate order follows.