Delores DEVINES, Antoinette Stokes, Sarita Beason, and Nick Sutherland, Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Henry W. MAIER, Individually and in his official capacity as Mayor of the City of Milwaukee; Wallace Burkee, Individually and in his official capacity as Director of the Community Development Agency; William Ryan Drew, Individually and in his official capacity as Commissioner of the Department of City Development; Gerald Anderson, Individually and in his official capacity as Department of City Development Relocation Officer; Leonard E. Sloane, Individually and in his official capacity as Deputy Inspector of Buildings; the City of Milwaukee, a Municipal Corporation; and their agents, employees, successors in office, assistants, and all others acting in concert or cooperation with them or at their direction or under their control, Defendants.

Civ. A. No. 78–C–742.

United States District Court, E. D. Wisconsin.

Aug. 9, 1980.

Lawrence G. Albrecht, Thomas P. Donegan, Louis J. Mestre, Legal Action of Wisconsin, Inc., Milwaukee, Wis., for plaintiffs.

James B. Brennan, City Atty. by Maurice L. Markey, Asst. City Atty., Milwaukee, Wis., for defendants.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

Plaintiffs in this action for declaratory and injunctive relief have mounted a broad challenge to the City of Milwaukee's system of housing code enforcement and payment of relocation benefits to persons displaced from their homes as a result of such enforcement. The action was brought by four Milwaukee residents who were ordered to vacate their rented living quarters as a result of the City's code enforcement activities.* Although the City provides relocation benefits to some tenants who are forced to leave their homes due to housing code enforcement, none of the named plaintiffs were found eligible to receive such benefits. They were consequently forced to pay the cost of moving to other housing out of their own pockets.

Plaintiffs originally challenged both the denial of benefits and the City's failure to provide them with administrative hearings by which to appeal such denials. The City has since agreed to provide hearings to persons who are declared ineligible for relocation benefits and the only issue that remains is whether the City can restrict the payment of benefits to those persons who meet its eligibility requirements. The City contends that it is not legally obligated to provide any relocation benefits whatsoever and consequently can limit the payment of such benefits in whatever manner it sees fit. Plaintiffs, on the other hand, contend that payments to all displaced tenants are required by the just compensation clause of the Fifth Amendment, Wis. Stats. § 32.19, the Uniform Relocation Act, 42 U.S.C. § 4601 et seq., and the Housing and Com-

munity Development Act of 1974, 42 U.S.C. § 5301 et seq. Both sides have moved for summary judgment.

The material facts of the instant case are not in dispute. Beginning in 1975, the City has received what are known as Community Development Block Grants from the United States Department of Housing and Urban Development ("HUD"). The block grant program is a method of distributing federal housing and community development funds to the nation's cities in a manner which allows the participating cities to determine, within certain statutory guidelines, precisely how those funds will be spent. The program is administered pursuant to the Housing and Community Development Act of 1974.

A city applying for a block grant from HUD must submit a detailed application describing the different programs to which the grant will be applied. The types of local housing and community development programs which are eligible for block grant funding are set out at 42 U.S.C. § 5305. Among the eligible programs are those designed to improve housing code enforcement in deteriorating neighborhoods, 42 U.S.C. § 5305(3), and those designed to provide relocation payments and assistance to persons who are displaced by activities funded through the block grant program. 42 U.S.C. § 5305(11).

In 1975, the City of Milwaukee submitted its first application for block grant funding. The City applied for and received approximately $13,383,000 from HUD for use in a wide variety of programs designed to improve Milwaukee housing. In particular, $104,500 was allocated to the Intensive Code Enforcement Program ("ICEP"), and $206,400 was allocated to the Code Enforcement Relocation Program ("CERP"). ICEP was designed to improve housing code enforcement in certain deteriorating areas of the City. CERP was designed to provide

---

* On September 24, 1979, this Court certified this case as a class action on behalf of all tenants who are or will be displaced from their homes by order of the Milwaukee Department of Building Inspection and Safety Engineering and who fail to receive any financial compensation to which they are legally entitled.

relocation benefits to occupants of condemned housing.

The City has continued to receive yearly block grant funding from HUD. The ICEP and CERP programs have continued to receive appropriations from the yearly grants. The amounts allocated to ICEP have increased almost yearly since the initial 1975 grant, and now stand at $400,000 a year. The CERP funding, however, was decreased to $170,000 in 1976, and to $50,000 a year thereafter.

Although the funding allocated to CERP has steadily decreased over the years, the funds that have been allocated have never been fully utilized. From 1975 through 1978, a total of $476,400 was allocated to the CERP while only $116,336 of that amount was actually provided to displaced tenants. The CERP funds that were not used were "reprogrammed" into other block grant programs which came up short of funds in a given year.

The CERP surpluses can no doubt be attributed to the fairly restrictive conditions the City has placed on the distribution of CERP funding. According to the most recent CERP Policy Statement issued by the City, in order to be eligible for CERP benefits, a potential recipient must: (1) reside within the geographic area designated in the City's block grant application (a low income area which is practically coterminous with the ICEP target area); (2) be a "family" or an "individual" which is in lawful occupancy of a rented dwelling; and (3) be served with a "notice to vacate" because the building has been ordered razed and removed pursuant to Wisconsin law. Tenants who are ordered to vacate because their building contains code violations that are not severe enough to require that the building be razed are not eligible for relocation benefits. From 1975 through 1978, the City provided CERP benefits to 52 households which were displaced from buildings scheduled to be razed. During that same time period, 395 households were served with notices to vacate as a result of the City's ICEP activities. A review of the City's code enforcement records shows that the great majority of those required to vacate their living quarters were not eligible for CERP relocation benefits because the code violations at issue were not severe enough to require that the buildings involved be razed.

Therein lies the heart of the present controversy. Plaintiffs and the class they represent are tenants who have been displaced by the City's ICEP activities but who are not eligible for CERP relocation benefits. As demonstrated by the affidavits submitted by the plaintiffs, tenants who are forced to vacate their living quarters due to remedial code violations are really in no better position than those tenants who are forced to vacate because their buildings are scheduled to be razed. The tenant who is ordered to vacate because of rat infestation or lack of heat, code violations which do not require that the affected building be razed, are still required to find other housing and bear the expense of moving. Once new housing has been located, a lease signed, the security deposit and first month's rent paid, and the household furnishings moved, the displaced tenant cannot be expected to return to his old dwelling once the code violations have finally been corrected. Thus for all practical purposes, tenants forced to relocate due to what the City terms "temporary" code violations are put to the same trouble and expense as tenants who are forced to vacate a building which is scheduled to be razed. The question to be resolved is whether tenants who are displaced due to temporary or remedial code violations are entitled to the same benefits that tenants of condemned buildings now receive.

It is important at this point to state what the case is not. Plaintiffs are not raising an equal protection challenge to the City's CERP eligibility requirements. They do not claim that they are entitled to benefits because a similarly situated class already receives them. Instead, they claim a substantive right to such benefits, derived from the United States Constitution and from federal and state law. In order to evaluate plaintiffs' claim it is therefore necessary to

examine the various sources of substantive law under which entitlement to the benefits is claimed.

*Just Compensation Clause*

The Fifth Amendment to the United States Constitution provides "[N]or shall private property be taken for public use, without just compensation." The Fifth Amendment is applicable to the states by operation of the Fourteenth Amendment. *Atlantic Coast Line Railroad Company v. City of Goldsboro, North Carolina*, 232 U.S. 548, 555, 34 S.Ct. 364, 366, 58 L.Ed. 721 (1914). The question posed by the plaintiffs is whether the City must compensate tenants whose leasehold rights are "taken" as a result of the City's code enforcement activities.

It is well established that leasehold interests are property within the meaning of the Fifth Amendment. *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946). Thus if the government physically appropriates premises formerly occupied under a valid lease, it is required to compensate the leaseholder for the loss it incurs. *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). In this case, of course, the City has not attempted to take physical possession of the living quarters occupied by the plaintiffs. Arguably, however, the City, by requiring the plaintiffs to vacate the premises, has effectively destroyed the value of their leasehold interests. Under some circumstances, government regulations which have the effect of drastically reducing the value of a property interest will be held to be a compensable taking. *Pennsylvania Coal Company v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

Traditionally, however, government regulations which are designed to promote public health and safety are not considered takings which require the payment of compensation even though such regulations may totally destroy the value of the affected property. Significantly, it has never been held that *owners* of buildings which are placarded or razed due to building code violations are entitled to just compensation.

See, Mandelker, *Housing Codes, Building Demolition, and Just Compensation: A Rationale for the Exercise of Public Powers Over Slum Housing*, 67 Mich.L.Rev. 6345 (1969); *Annotation: Constitutional Rights of Owners as Against Destruction of Building by Public Authorities*, 14 A.L.R.2d 73 (1950) and the cases cited therein.

▮ Plaintiffs suggest no reason why the rule should be different for tenants. While a tenant forced to relocate due to code enforcement may be a more sympathetic figure than his landlord, the distinction is without constitutional significance. Housing code enforcement is a valid and important exercise of the municipal police power. Such measures are not designed to appropriate property for public use at private expense, *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1969), but rather are designed to prevent the injury and disease which are so often the byproducts of substandard housing. The power of municipal governments to so protect their citizens cannot "consistently with the existence and safety of organized society" be burdened with the requirement that compensation be paid to anyone who is put to expense be the exercise of that power. *Mugler v. Kansas*, 123 U.S. 623, 669, 8 S.Ct. 273, 301, 31 L.Ed. 205 (1887).

This conclusion also disposes of plaintiffs' argument that compensation is required by § 32.19 of the Wisconsin Statutes. Chapter 32 dealing with the powers of eminent domain is merely the legislative implementation of the just compensation requirement, *Howell Plaza, Inc. v. State Highway Commission*, 66 Wis.2d 720, 226 N.W.2d 185 (1975), which, as discussed above, is not applicable under these circumstances.

*Uniform Relocation Act*

Plaintiffs next argue that they are entitled to compensation as "displaced persons" within the meaning of the Uniform Relocation Act, 42 U.S.C. § 4601 *et seq.* Section 4601(6) of the Act defines "displaced person" as:

" * * * [A]ny person who * * * moves from real property, or moves his person property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance. * * * "

Persons who qualify under this definition are eligible for a variety of federal relocation benefits. See 42 U.S.C. §§ 4622–4625. Plaintiffs claim entitlement to such benefits as persons forced to move from real property as a result of a written order of an acquiring agency for a program undertaken with federal financial assistance.

The United States Supreme Court has recently analyzed the Uniform Relocation Act and concluded that payments are only required in connection with "the actual or proposed acquisition of property for a federal program." *Alexander v. United States Department of Housing and Urban Development,* 441 U.S. 39, 62, 99 S.Ct. 1572, 1587, 60 L.Ed.2d 28 (1979). "Congress did not expect to provide assistance for all persons somehow displaced by Government programs." *Id.* at 60, 99 S.Ct. at 1585. The purpose of the Act is "limited" and is not to be expanded beyond the acquisition context. *Id.* at 57–58, 99 S.Ct. at 1584–85.

■ While the Court did state that "acquisition" does not necessarily require that the government take title to the affected property, there is a requirement that the government take the property for its own use. *Id.* at 62–63 n. 41, 99 S.Ct. at 1586–87 n. 41. In the instant case, it cannot be said that the City has acquired or obtained the use of the buildings it placards for code violations. The Act clearly calls for physical occupancy or use by the acquiring agency. The fact that the City orders a building closed does not mean that the City has acquired the building's use. Accordingly, plaintiffs cannot be considered "displaced persons" entitled to relocation benefits under the Act.

Plaintiffs also contend that they are entitled to benefits under 42 U.S.C. § 4637. That section provides that persons who move from their dwellings as result of any program which receives funding under Title 1 of the Housing Act of 1949 "shall be deemed to be displaced as the result of the acquisition of real property" and thus eligible for benefits under the Act.

Plaintiffs concede that ICEP is funded pursuant to the Housing and Community Development Act of 1974 rather than the Housing Act of 1949. They argue, however, that since the Housing and Community Development Act of 1974 was passed after the enactment of the Uniform Relocation Act and since the purpose of the Housing and Community Development Act of 1974 was to consolidate and simplify programs previously funded under the Housing Act of 1949, that programs funded under the Housing and Community Development Act of 1974 should be treated in the same manner as programs funded under the Housing Act of 1949 for purposes of eligibility for benefits under the Uniform Relocation Act.

■ The fallacy of this argument is demonstrated by the fact that when Congress passed the Housing and Community Development Act of 1974, it provided that funds "may" be used for relocation benefits to persons displaced by activities funded by the Act. 42 U.S.C. § 5305. Thus Congress specifically considered the issue of relocation benefits and determined that block grant recipients could, but need not, provide such benefits. If Congress had intended to make such payments mandatory it could have so provided, either in the text of the Act itself, or by amending § 4637 of the Uniform Relocation Act to provide that persons who are forced to move from their dwellings as a result of projects funded under the block grant program would be deemed to have been displaced as the result of the acquisition of real property. Having done neither, it cannot be concluded that Congress intended that any person who is displaced as a result of a program funded under the Housing and Community Devel-

opment Act of 1974 is entitled to relocation benefits pursuant to the Uniform Relocation Act.

*Housing and Community Development Act of 1974*

Plaintiffs' final argument is that they are entitled to relocation benefits under the terms of the Housing and Community Development Act of 1974 itself. Specifically, plaintiffs contend that HUD should not have approved the City's application for funding for the ICEP and CERP programs because (1) the programs are not designed to "principally benefit" persons of low or moderate incomes; and (2) the programs are "plainly inappropriate" to meeting the needs and objectives identified by the City in its block grant applications.

Section 5304(c) of 42 U.S.C. sets forth the standards by which the Secretary of HUD is to review applications for funding under the Housing and Community Development Act of 1974:

"(c) The Secretary shall approve an application * * * unless—

＊　＊　＊　＊　＊　＊

"(2) on the basis of the application, the Secretary determines that the activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the applicant * * *: or

"(3) the Secretary determines that the application does not comply with the requirements of this chapter or other applicable law or proposes activities which are ineligible under this title."

The courts have the power to review the Secretary's determinations under this section in order to correct abuses of discretion or actions which are clearly arbitrary and capricious. *Broaden v. Harris*, 451 F.Supp. 1215, 1225 (W.D.Pa.1978).

Plaintiffs' argument that the City's block grant applications do not comply with the requirements of the Housing and Community Development Act of 1974 is without merit. Plaintiffs have attempted to show that a program which does not provide full relocation benefits to displaced tenants is not designed to "primarily benefit" low and moderate income persons as required by 42 U.S.C. § 5301(c). The fact, however, that low and moderate income persons are not benefitted to the extent that plaintiffs feel appropriate does not mean that they are not benefitted at all. The ICEP and CERP programs are designed to improve the housing stock in Milwaukee's blighted areas, to protect low income persons from the health and safety dangers that can result from living in substandard housing, and to provide relocation benefits to persons whose living quarters are in such poor condition that a raze order has been issued. All of these objectives primarily benefit low and moderate income persons and it was not an abuse of discretion on the part of the Secretary of HUD to so determine.

Nor is there merit to the argument that the City's application should have been disapproved because the ICEP and CERP are plainly inappropriate to the needs and objectives identified by the City. In its 1975 block grant application, the City identified the long term objective of CERP as follows:

"Code enforcement relocation assistance will ensure that unreliable structures that are condemned for human habitation will promptly be razed on a routine basis. This will eliminate health, safety hazards, and blighting influences and facilitate renewal development by relocating households into decent, safe and sanitary housing as the Community's housing stock ages."

There is nothing about CERP, either on its face or as administered by the City, which is inappropriate to the fulfillment of this objective. Significantly, the City served notice from the beginning that CERP would only provide relocation benefits in situations where the affected building was ordered to be razed. CERP, as implemented by the City, was not designed to provide benefits to every person displaced by code enforcement. The program *could* have been more broadly based, but it was not required to be. The question of how the benefits are to be administered is, within the framework of the community

development block grant program, entirely up to the City. Any attempt to change the manner in which the benefits are to be administered must be mounted through the legislative rather than the judicial process.

IT IS THEREFORE ORDERED that the plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted.