Delores DEVINES, et al., Plaintiffs-Appellees, Cross-Appellants,

v.

Henry W. MAIER, et al., Defendants-Appellants, Cross-Appellees.

Nos. 83–1307, 83–1352 and 83–2587.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1983.

Decided Feb. 17, 1984.*

Patrick B. McDonnell, Asst. City Atty., Milwaukee, Wis., for defendants-appellants, cross-appellees.

Louis J. Mestre, Legal Action of Wisconsin, Inc., Milwaukee, Wis., for plaintiffs-appellees, cross-appellants.

---

* This opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing *en banc* on the question of overruling *Devines v. Maier*, 665 F.2d 138 (7th Cir.1981).

Before COFFEY and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.**

COFFEY, Circuit Judge.

Appellants, cross-appellees, Henry W. Maier, et al., appeal the judgment of the United States District Court, Eastern District of Wisconsin ordering the City of Milwaukee to compensate Devines, et al., with relocation benefits. Cross-appellants, Devines, et al., appeal the district court's calculation of relocation benefits. We reverse the district court's January 21, 1983 judgment on the issue of compensation under the Fifth Amendment and Wis.Stat. § 32.-19, and remand this case on the limited issue of determining if attorney's fees are warranted under 42 U.S.C. § 1988 (Supp. IV 1980).

I.

The material facts of this case were initially set forth by the district court in *Devines v. Maier,* 494 F.Supp. 992 (E.D.Wis. 1980). The case was appealed, and this court, in reversing and remanding the district court's decision, again set forth the material facts in *Devines v. Maier,* 665 F.2d 138 (7th Cir.1981) (*"Devines I"*). Thus, for purposes of this appeal, arising out of the district court's judgment on remand, we will summarily review only those material facts pertinent to the present decision.

In 1975, the City of Milwaukee applied for and received a Community Development Block Grant from the United States Department of Housing and Urban Development ("HUD"). As the district court noted in its original opinion of August 9, 1980, "[t]he block grant program is a method of distributing federal housing and community development funds to the nation's cities in a manner which allows the participating cities to determine, within certain statutory guidelines, precisely how those funds will be spent." *Devines v. Maier,* 494 F.Supp. at 993. Between 1975 and 1978, the types of local housing and community development programs eligible for funding under the Community Development Block Grant included programs to improve housing code enforcement in deteriorating neighborhoods, *see* 42 U.S.C. § 5305(3) (1976), and programs to provide persons displaced by activities funded through the block grant program with relocation payments and assistance, *see* 42 U.S.C. § 5305(11) (1976). In 1975, Milwaukee received approximately $13,383,000 in Community Development Block Grant funds, and allocated $104,500 to the Intensive Code Enforcement Program ("ICEP") and $206,400 to the Code Enforcement Relocation Program ("CERP"). Pursuant to 42 U.S.C. § 5305, the ICEP was designed to improve housing code enforcement in certain deteriorating areas of Milwaukee and the CERP was designed to provide relocation benefits to tenants of dwellings that the City ordered razed and removed under Wisconsin law.

Following 1975, the City continued to receive yearly block grant funds which were appropriated, in part, to the ICEP and the CERP.[1] The funds allocated to the CERP were never "fully utilized" and the excess money was " 'reprogrammed' into other block grant programs which came up short of funds in a given year." *Id.* at 994. According to the district court's original opinion of August 9, 1980, the surplus in CERP funds resulted from the City's restrictive eligibility requirements. *Id.* A CERP Policy Statement issued by the City revealed that a recipient of CERP funds had to:

> receive appropriations from the yearly grants. The amounts allocated to ICEP have increased almost yearly since the initial 1975 grant, and now stand at $400,000 a year. The CERP funding, however, was decreased to $170,000 in 1976, and to $50,000 a year thereafter."
> *Devines v. Maier,* 494 F.Supp. at 994.

---

** The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

1. The district court found, in its original opinion of August 9, 1980, that:
   "The City has continued to receive yearly block grant funding from HUD. The ICEP and the CERP programs have continued to

"(1) reside within the geographic area designated in the City's block grant application (a low income area which is practically coterminous with the ICEP target area); (2) be a 'family' or an 'individual' which is in lawful occupancy of a rented dwelling; and (3) *be served with a 'notice to vacate' because the building has been ordered razed and removed pursuant to Wisconsin law.*" (emphasis added). *Id.* According to these eligibility requirements only tenants lawfully residing in a designated geographic block, whose dwelling was "ordered razed and removed pursuant to Wisconsin law," qualified for CERP benefits. Thus, tenants ordered by the City to *temporarily* vacate a dwelling in violation of the housing code and determined by the City to be in need of repair were not eligible for CERP benefits. In addition, the district court found, in its original opinion of August 9, 1980, that "for all practical purposes, tenants forced to relocate due to what the City term[ed] 'temporary' code violations [were] put to the same trouble and expense as tenants who [were] forced to vacate a building which [was] scheduled to be razed." *Id.*

Appellee Devines represents a class of tenants who were ordered to *temporarily* vacate their dwelling under Milwaukee's ICEP but failed to qualify for CERP benefits. In 1979 appellees brought a class ac-

tion against the City of Milwaukee, and its mayor, Henry W. Maier, in the United States District Court for the Eastern District of Wisconsin, alleging that the City failed to provide class members with financial compensation upon their being displaced pursuant to the ICEP. The class members claimed, *inter alia,* that the City's actions violated the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq.* (1976) ("Uniform Relocation Act"), the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.* (1976) ("Community Development Act"), the Just Compensation Clause of the Fifth Amendment, and Wis.Stat. § 32.19.[2]

Plaintiffs and defendants filed motions for summary judgment and on August 9, 1980, the district court granted defendants' motion for summary judgment. *See Devines v. Maier,* 494 F.Supp. 992 (E.D.Wis. 1980). The district court, in its original decision, ruled that government regulations designed to promote public health and safety, such as the City of Milwaukee's housing code enforcement, were not "takings" within the meaning of the Fifth Amendment, and thus the plaintiffs were not entitled to compensation under the Fifth Amendment or Wis.Stat. § 32.19. *Id.* at 995. The court further ruled that because the City of Mil-

2. The class members also alleged that the City's failure to provide them with an administrative hearing to challenge the denial of relocation benefits violated the Due Process Clause of the Fourteenth Amendment and Wis.Stat. § 68. In addition, plaintiff Devines claimed, individually, that the City's actions violated the Equal Protection Clause of the Fourteenth Amendment, HUD regulations contained in 42 C.F.R. § 570.602(d), and the City's CERP eligibility statement. Plaintiff Devines also claimed money damages suffered as a result of the City's failure to provide her with appropriate benefits.

According to the plaintiffs' complaint, on January 26, 1978, the City of Milwaukee ordered that the building in which Devines' resided be razed and removed. The Milwaukee County Circuit Court issued a temporary restraining order preventing the razing of the building but on February 18, 1978, Devines moved from those premises. On May 3, 1978, a final injunction was entered in the Milwaukee

County Circuit Court enjoining the City from razing the building but authorizing enforcement of the building code violations. Devines, et al., filed suit in district court and on October 2, 1979, the district court approved a stipulation whereby the City agreed to pay CERP benefits to Devines, individually, and to all other tenants of the building who vacated their premises before the City's January 26, 1978 order was enjoined in Milwaukee County Circuit Court. Thus, pursuant to Fed.R.Civ.P. 41, the court dismissed Devines' individual claims. On October 5, 1979, the court approved another stipulation in which the City agreed to provide all tenants ordered to vacate their dwelling with notice of their right to apply for relocation benefits and their right to an administrative hearing in the event that relocation benefits were denied. Thus, pursuant to Fed.R.Civ.P. 41, the court dismissed plaintiffs' claims under the Due Process Clause of the Fourteenth Amendment and Wis.Stat. § 68.

waukee was not "acquir[ing] the building's use," the plaintiffs failed to qualify as "displaced persons" under the Uniform Relocation Act and, therefore, were not entitled to compensation under the Act. *Id.* at 996. The court finally ruled that the City's ICEP and CERP "primarily benefit[ted] low and moderate income persons," thereby complying with the federal block grant regulations and precluding the plaintiffs from receiving relocation benefits under the Community Development Act. *Id.* at 997. Plaintiffs appealed the district court's judgment on the issue of compensation under the Fifth Amendment, Wis.Stat. § 32.19, and the Uniform Relocation Act.

On November 23, 1981, this court affirmed the district court's denial of relocation benefits under the Uniform Relocation Act, holding that the City's order to temporarily vacate uninhabitable dwellings "did not constitute an acquisition under 42 U.S.C. § 4601(6), and that the plaintiffs were not 'displaced persons,'" entitled to benefits under the Act. *Devines I,* 665 F.2d at 148. The court, however, reversed and remanded on the issue of just compensation under the Fifth Amendment and Wis.Stat. § 32.19. In the majority opinion, this court held that the City's determination that a dwelling was uninhabitable constituted a regulatory taking of plaintiffs' leasehold rights for a public purpose, and thus entitled plaintiffs to just compensation under the Fifth Amendment and Wis.Stat. § 32.-19. The court remanded for a determination of what compensation would be just under the Fifth Amendment and Wis.Stat. § 32.19. In a concurring opinion, Judge Fairchild agreed with the reasoning of the majority but noted that, "[T]here is a taking only insofar as there was room for the exercise of discretion. Where the evidence of uninhabitability is so overwhelming that no reasonable person could conclude to the contrary the mere adjudication of that status by the state does not require compensation."[3] *Id.* at 148 (Fairchild, J., concurring).

On remand the district court, pursuant to the court's mandate in *Devines I,* entered summary judgment for the plaintiffs and ordered the City of Milwaukee to compensate the plaintiffs with a relocation rent differential payment, actual moving expenses, and actual moving related expenses. On July 26, 1983, the district court awarded the plaintiffs $35,000 in attorney's fees as the "prevailing party" under 42 U.S.C. § 1988. On appeal, Mayor Henry W. Maier, et al., request this court to:

A. Review the decision in *Devines I* on the issue of just compensation under the Fifth Amendment in light of the United States Supreme Court's holding in *Texaco, Inc. v. Short,* 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982) and the Court's dicta in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

On cross appeal, Devines, et al., contend that:

B. Wis.Stat. § 32.19 is the standard to be followed in calculating plaintiff's compensation.

We shall deal with these issues individually.

## II.

### A. *DEVINES I*

In *Devines I* this court ruled that the City of Milwaukee's order to temporarily vacate uninhabitable dwellings constituted a public taking within the meaning of the Fifth Amendment, and entitled the class of affected plaintiffs to just compensation. On appeal, Henry W. Maier, et al., urge this court to reconsider its ruling in light of the United States Supreme Court's recent holding in *Texaco, Inc. v. Short,* 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982) ("*Texaco*") and the Court's recent dicta in *Loretto v. Teleprompter Manhattan CATV Corp.,* 484 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) ("*Loretto*"). Before addressing the appellants' claim, this court must initially determine the effect to be

**3.** Judge Fairchild added that the issue of whether a dwelling is "so uninhabitable that no reasonable person could find otherwise ... is an issue of fact that had to be left for determination by the factfinder." *Devines I,* 665 F.2d at 148 (Fairchild, J., concurring).

given our prior disposition of the Fifth Amendment issue in *Devines I.*

This court has "long held that 'matters decided on appeal become the law of the case to be followed ... on second appeal, in the appellate court, unless there is plain error of law in the original decision.'" *Appleton Electric Co. v. Graves Truck Line, Inc.,* 635 F.2d 603, 607 (7th Cir.1980), *cert. denied,* 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981) (quoting *Kaku Nagano v. Brownell,* 212 F.2d 262, 263 (7th Cir. 1954)) (*"Appleton"*). *See also Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 532 (7th Cir. 1982). In *Appleton,* this court explained that the "law of the case" doctrine does not limit a court's power to reconsider its prior ruling, but is:

> "based on the salutary and sound public policy that litigation should come to an end. It is predicated on the premise that 'there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate of chances from changes in its members,' and that it would be impossible for an appellate court 'to perform its duties satisfactorily and efficiently' and expeditiously 'if a question, once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal' thereof."

635 F.2d at 607–08 (quoting *White v. Murtha,* 377 F.2d 428, 431 (5th Cir.1967)). *See also Gertz v. Robert Welch, Inc.,* 680 F.2d at 532. The "law of the case" doctrine, however, is not an immutable concept, "and should not be applied where the law as announced is clearly erroneous, and establishes a practice which is contrary to the best interests of society, and works a manifest injustice in the particular case." *United States v. Habig,* 474 F.2d 57, 60 (7th Cir.) *cert. denied* 411 U.S. 972, 93 S.Ct. 2145, 36 L.Ed.2d 695 (1973) (quoting *Luminous Unit Co. v. Freeman-Sweet, Co.,* 3 F.2d 577, 580 (7th Cir.1924)). Accordingly, this court has, on a limited number of occasions, reconsidered a previous adjudication and has concluded that our former ruling was clearly erroneous. *See, e.g., Appleton,* 635 F.2d at 608; *United States v. Habig,* 474 F.2d at 60.

The decision of this court in *Devines I* was written prior to the United States Supreme Court's holding in *Texaco* and its dicta in *Loretto* on the issue of whether a state's regulatory action constitutes a taking of private property for public use within the meaning of the Fifth Amendment. In order to properly analyze the issue of whether the City of Milwaukee's enforcement of its housing code, whereby tenants are ordered to temporarily vacate uninhabitable dwellings, constitutes a public taking within the meaning of the Fifth Amendment, we find it necessary to reconsider this court's holding in *Devines I,* in light of *Texaco* and *Loretto.* Our decision to reconsider the holding in *Devines I* is further buttressed by the concurring opinion in *Devines I* that "[w]here the evidence of uninhabitability is so overwhelming that no reasonable person could conclude to the contrary the mere adjudication of that status by the state does not require compensation." 665 F.2d at 148 (Fairchild, J., concurring). This statement reveals an apparent unclarity in *Devines I* with regard to when, if ever, an order to temporarily vacate an uninhabitable dwelling constitutes a public taking within the meaning of the Fifth Amendment, thereby entitling the affected tenants to just compensation. The United States Supreme Court's language in *Texaco* and *Loretto* resolves the apparent unclarity of *Devines I.*

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, provides, "[N]or shall private property be taken for public use, without just compensation." In *Devines I,* this court properly determined that leasehold interests are property interests protected by the Fifth Amendment. 665 F.2d at 141. *See, e.g., Alamo Land & Cattle Co., Inc. v. Arizona,* 424 U.S. 295, 303, 96 S.Ct. 910, 916, 47 L.Ed.2d 1 (1976); *United States v. Petty Motor Co.,* 327 U.S. 372, 378, 66 S.Ct. 596, 600, 90 L.Ed. 729 (1946). We noted that, "[t]o a great extent, whether or not a regulation of private property rights for a public purpose constitutes a taking depends upon

the extent of interference with the private right. When the 'regulation goes too far, it will be recognized as a taking.'" 665 F.2d at 141 (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)). *See also Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 174–75, 100 S.Ct. 383, 389–90, 62 L.Ed.2d 332 (1979); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 123–28, 98 S.Ct. 2646, 2659–61, 57 L.Ed.2d 631 (1978); *Matter of Gifford,* 688 F.2d 447, 455–56 (7th Cir.1982).

In *Devines I,* the City of Milwaukee argued that "because state law made continued occupancy of [uninhabitable] buildings illegal, the plaintiffs had no legitimate rights to occupy the structures and thus ... the orders to vacate did not interfere with any legal property interests of the plaintiffs." 665 F.2d at 143. This court rejected the City's argument based upon the fact that "the determination that a building is uninhabitable requires an administrative determination that involves the discretion of the building inspector," *id.* at 144, and thus the plaintiffs had a legal right to occupy their rental dwellings until those rights were terminated by the City's enforcement of its housing code. This court concluded that the plaintiffs' "rights were so completely destroyed by the City's action that a regulatory taking of plaintiffs' rights occurred," *id.,* and that such taking was "in order to promote public interest in safety, health, morals, and the general welfare." *Id.* at 146. Accordingly, the court held "that the plaintiffs [were] entitled by the Fifth Amendment to just compensation for the regulatory taking of their leasehold rights for a public purpose ...." *Id.*

Since that decision in November 1981, the United States Supreme Court has in two other cases further clarified the issue of regulatory takings under the Fifth Amend-

ment. In *Texaco* the Court considered the constitutionality of an Indiana statute, the Dormant Mineral Interests Act, Ind.Code § 32–5–11–1 *et seq.* (1976) ("Mineral Lapse Act"), which provided that "a severed mineral interest that is not used for a period of 20 years automatically lapses and reverts to the current surface owner of the property, unless the mineral owner files a statement of claim in the local county recorder's office." 454 U.S. at 518, 102 S.Ct. at 786. The "use" of a mineral interest, sufficient to preclude its extinction, included "the actual or attempted production of minerals, the payment of rents or royalties, and any payment of taxes." *Id.* at 519, 102 S.Ct. at 786.[4] The Court initially ruled that the State of Indiana had the power to enact the Mineral Lapse Act because,

> "just as a State may create a property interest that is entitled to constitutional protection, *the State has the power to condition the permanent retention of that property right on the performance of reasonable conditions that indicate a present intention to retain the interest.*" (emphasis added).

*Id.* at 526, 102 S.Ct. at 790. In response to the plaintiffs' claim that the Mineral Lapse Act "takes private property without just compensation," the Court ruled:

> "In ruling that private property may be deemed to be abandoned and to lapse upon the failure of its owner to take reasonable actions imposed by law, *this Court has never required the State to compensate the owner for the consequences of his own neglect.* We have concluded that the State may treat a mineral interest that has not been used for 20 years and for which no statement of claim has been filed as abandoned; it follows that, after abandonment, the former owner retains no interest for which he may claim compensation. *It is the owner's failure to make any use of the*

4. The Supreme Court noted that an exception to the general lapse rule existed, "if an owner of 10 or more interests in the same county files a statement of claim that inadvertently omits some of those interests, the omitted interests may be preserved by a supplemental filing made within 60 days of receiving actual notice of the lapse." *Texaco,* 454 U.S. at 519–20, 102 S.Ct. at 786–87.

*property—and not the action of the State—that causes the lapse of the property right; there is no 'taking' that requires compensation. The requirement that an owner of a property interest that has not been used for 20 years must come forward and file a statement of claim is not itself a 'taking'."* (emphasis added). *Id.* at 530, 102 S.Ct. at 792. In sum, the Court in *Texaco* clearly provides that a State can place reasonable conditions on a property right that it creates, and that no Fifth Amendment "taking" occurs when an owner's failure to make any use of the property causes the lapse of a property right.

The Court's language in *Texaco* is directly applicable to the facts in this instance where the State of Wisconsin creates a property right, in the form of a possessory interest in the leasehold, and conditions that property right on the continued habitability of the leasehold.[5] Pursuant to Wis. Stat. § 704.05(2) (1981), the State of Wisconsin confers upon tenants "the right to exclusive possession of the premises" for the term of their lease. The State then conditions this right on the reasonable condition that the premises remain fit for human habitation. Wis.Stat. § 66.05(1)(a)

(1981) provides that a municipality, such as the City of Milwaukee:

"may order the owner of premises upon which is located any building or part thereof within such municipality, which in its judgment is so old, dilapidated or has become so out of repair as to be dangerous, unsafe, insanitary or otherwise unfit for human habitation, occupancy or use, and so that it would be unreasonable to repair the same, to raze and remove such building or part thereof, or if it can be made safe by repairs to repair and make safe and sanitary . . . ."

*See also,* sections 12–3(4), (5), Milwaukee Code of Ordinances (1981). Wis.Stat. § 66.-05(2)(a) further provides that if a municipality declares a building unfit for human habitation and repair of the building is feasible, then the building inspector shall post a placard on the premises that reads "This Building Cannot Be Used For Human Habitation, Occupancy, or Use." *See also* section 12–3(6) Milwaukee Code of Ordinances (1981). Finally, Wis.Stat. § 66.05(2)(c) provides that any person who rents, leases, or occupies a building that has been condemned for human habitation is subject to a fine not less than $5.00 or more than $50.00 or imprisoned not more than 30 days for each week of such violation.[6] According

---

5. The facts in the instant case are more in line with those in *Texaco* than with those in *San Diego Gas & Electric Co. v. San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (*"San Diego"*), a case upon which the court in *Devines I* placed significant reliance. In *San Diego,* the plaintiff acquired land in 1966 as a possible site for a nuclear power plant to be constructed in the 1980's. At the time of purchase, "most of the land was either zoned for industrial use or in an agricultural 'holding' category." 450 U.S. at 624, 101 S.Ct. at 1289. In 1973, the land was placed among the City of San Diego's "open-space areas," and it was proposed that the property be preserved as parkland. The plaintiff filed suit alleging that the City had taken its property without just compensation in violation of the Fifth Amendment. The majority opinion held that the California Court of Appeal decision was not final and thus the United States Supreme Court was without jurisdiction to review the case. Justice Brennan dissented, and expressing the view of at least five members of the Court as to the merits, claimed that the City's actions did constitute a public taking within the meaning of

the Fifth Amendment. It must be noted, however, that in *San Diego,* the Court never reached the issue of whether the City's rezoning laws constituted a public taking within the meaning of the Fifth Amendment. Furthermore, the facts in *San Diego* and all similar zoning ordinance cases arising under the Just Compensation Clause of the Fifth Amendment are markedly distinct from the facts in this instance. In *San Diego,* it was not the activity or inactivity of the plaintiff utility company that caused the City to rezone certain property, rather the City was merely exercising its power to regulate land use. In the instant case, however, it is the failure of the landlords and/or tenants to maintain their premises in a condition fit for human habitation that causes the premises to become uninhabitable and declared so by the City. *See, e.g.,* Wis.Stat. § 704.07.

6. The City of Milwaukee's housing code, presently embodied in section 12–3, Milwaukee Code of Ordinances, is substantially similar to the State of Wisconsin's housing code, embodied in Wis.Stat. § 66.05. Section 12–3 of the Milwaukee Code of Ordinances was enacted

to Wis.Stat. § 704.05(2) the State of Wisconsin creates a property right in the form of "exclusive possession of the premises" but pursuant to the housing code provisions, embodied in Wis.Stat. § 66.05 and section 12–3 Milwaukee Code of Ordinances, the State of Wisconsin and the City of Milwaukee condition that interest on the reasonable condition that the premises remain fit for human habitation during the tenant's period of exclusive possession.

This court has already determined that the housing codes for the State of Wisconsin and the City of Milwaukee are a valid exercise of the police power, enacted in order to promote the public interest in safety, health, morals, and general welfare. *Devines I*, 665 F.2d at 145–46.[7] The plaintiffs

pursuant to Wis.Stat. § 62.17, and, at the time in question, was embodied in sections 12–4 and 51–14 of the *Milwaukee Code of Ordinances*. *See Devines I*, 665 F.2d at 143.

Section 12–3 of the Milwaukee Code of Ordinances provides:

"(4) UNSAFE BUILDINGS, STRUCTURES, OR EQUIPMENT.

Whenever the Commissioner of Building Inspection shall find any building, structure, or equipment, or any part thereof, in an unsafe condition because of the insufficiency of stairs, exits, or structural strength thereof, or in danger from fire, due to defects in construction, or because of deterioration, removal of any appliance, device, or equipment required by this code, or because of the hazardous manner in which it is used, or because of any other defects endangering life, limb, or property, or because of illegal occupancy or use of any building or structure, he shall serve a written order on the owner of the premises and the persons occupying or using any such building, structure, equipment or premises to discontinue such occupancy or use at once, or as ordered, and thereafter until such defects have been corrected in accordance with the regulations of this code.

(5) DWELLING UNITS CONDEMNED AS UNFIT FOR HUMAN HABITATION.

(a) The Commissioner of Building Inspection shall condemn as unfit for human habitation any dwelling or dwelling unit wherein he finds any of the following defects:

1. One which is so damaged, decayed, dilapidated, insanitary, difficult to heat, unsafe, or vermin infested, that it creates a hazard to the safety or welfare of the occupants or the public; or

2. One which lacks illumination, ventilation, or sanitary facilities adequate to protect the safety or welfare of the occupants or the public; or

3. One which, because of its general condition or location is insanitary or otherwise dangerous to the safety or welfare of the occupants or of the public.

(b) Any dwelling or dwelling unit may be condemned as unfit for human habitation by the Commissioner of Building Inspection if the owner or occupant failed to comply with any order based on the provisions of this code or any rules or regulations adopted pursuant thereto provided that such dwelling or dwelling unit is, in the opinion of the Commissioner, unfit for human habitation by reason of such failure to comply.

(6) PLACARDING OF BUILDINGS, STRUCTURES, OR EQUIPMENT.

(a) In all cases regulated in Section 12–2(2), (3), (4), and (5), the Commissioner of Building Inspection shall post at each entrance to such building, structure, or equipment, a notice to the effect that said building, structure, or equipment, is unsafe or unfit for human habitation and has been condemned; or that this building or structure is illegally occupied or used and shall be vacated at once as ordered.

(b) Such notice shall remain posted until the required repairs or alterations are made and it shall be unlawful for any person to remove such notice without written permission from the Commissioner of Building Inspection and it shall further be unlawful for any person to occupy or use or enter such building or structure thereafter, except for the purpose of making the required repairs or alterations."

7. As this court noted in *Devines I*, "The Statement of Purpose of the City of Milwaukee's housing code was originally codified at section 75–2 of the Milwaukee Code of Ordinances and subsequently was repealed and codified throughout the present chapter 51 of the Milwaukee Code of Ordinances." 665 F.2d at 145 n. 3.

In that statement the City declared that enactment of the housing code was essential to the public interests because:

"Part 2. It is hereby found and declared that premises exist within the City of Milwaukee which are blighted because there exists thereon blighted buildings, or other structures, either occupied or unoccupied by human beings, and such buildings or other structures are blighted because faulty design or construction, or failure to keep them in a proper state of repair, or lack of proper sanitary facilities, or lack of adequate lighting or ventilation, or inability to properly heat, or improper management, or any combination of these factors has resulted in such buildings or structures becoming so deteriorated, so

do not contest the constitutionality of the housing codes or their underlying policy to "reduc[e] the incidence of substandard urban housing." *Id.* at 146. Thus, the State of Wisconsin, just as the State of Indiana in *Texaco,* has created a property right entitled to constitutional protection, (i.e., a possessory interest in a leasehold) but conditions the retention of that right on a reasonable condition (i.e., inhabitability of the leasehold).

In further comparison of the facts in the instant case to those in *Texaco,* the uninhabitability of the leasehold interest, just as the lapse of a mineral interest in *Texaco,* occurs through no fault of the State. Pursuant to Wis.Stat. § 704.07, in the absence of an agreement to the contrary, the tenant has the duty to repair any damage caused by his negligence or improper use and to keep plumbing, electrical wiring, machinery, and equipment furnished with the premises in reasonable working order if the cost of repairs are minor in relation to the rent. Unless the repair was made necessary by the negligence or improper use of the tenant, the landlord has the duty to keep the premises, and all equipment under

his control, in a reasonable state of repair (i.e., fit for human habitation) and to make all necessary structural repairs. *See also* section 12–15 Milwaukee Code of Ordinances (1981).[8] Thus the uninhabitability of the leasehold interest is caused by the inattention of the landlord, as owner of the premises and/or the inattention of the tenant, as owner of a possessory interest in the premises. The United States Supreme Court in *Texaco,* presented with a similar fact pattern of owner inattention, stated that it is "the owner's failure to make any use of the property—and not the action of the State—that causes the lapse of the property right; *and there is no 'taking' that requires compensation."* (emphasis added) 454 U.S. at 530, 102 S.Ct. at 792.

Plaintiffs attempt to distinguish the facts in the instant case from those in *Texaco* on the ground that the Mineral Lapse Act in *Texaco* was self-executing, *see id.* at 533, 102 S.Ct. at 794, whereas the Milwaukee housing code requires a building inspector to make a discretionary determination that a building is uninhabitable. Plaintiffs correctly note that in *Devines I* this court

dilapidated, so neglected, so overcrowded with occupants, or so unsanitary as to jeopardize or be detrimental to the health, safety, morals, or welfare of the people of the city. It is hereby further found and declared that such blighted premises and such blighted buildings or other structures contribute to the development of, or increase in, disease, infant mortality, crime and juvenile delinquency; that conditions existing on such blighted premises are dangerous to the public health, safety, morals, and general welfare of the people, that conditions existing on such blighted premises necessitate excessive and disproportionate expenditure of crime prevention, fire protection, and other public services; that the conditions existing on blighted premises cause a drain upon public revenue and impair the efficient and economical exercise of governmental functions in such areas. It is hereby further found and declared that the elimination of blighted premises and the prevention of occurrence of blighted premises in the future is in the best interests of the citizens of this city, of the State of Wisconsin, and the entire United States; and that the accomplishment of this end will be fostered and encouraged by the enactment and enforcement of this ordinance."

8. Section 12–15, Milwaukee Code of Ordinances uses language identical to that of Wis. Stat. § 704.07. In addition, section 51–81, Milwaukee Code of Ordinances, promulgated pursuant to Wis.Stat. § 62–17, further provides:
    "51–81. Sanitary conditions.
    (1) CLEANLINESS.
    (a) Occupant's responsibility.
    Every occupant of a dwelling or dwelling unit shall keep in a clean and sanitary condition that part of the dwelling, dwelling unit premises thereof which he occupies or controls, and prior to moving, vacating, or relinquishing occupancy or control. Every occupant of a dwelling or dwelling unit shall properly dispose of all garbage and rubbish, in accordance with the requirements of this code.
    (b) Owner's responsibility.
    Every owner of a dwelling containing two (2) or more dwelling units and every owner of a premises where two (2) or more dwelling units share the same premises shall be responsible for maintaining in a clean and sanitary condition all communal, shared, or public areas of the dwelling and premises thereof which are used or shared by the occupants of two (2) or more dwelling units."

determined that the building inspector had to make a discretionary determination that a dwelling was uninhabitable, and thus the Milwaukee housing code was not a self-executing statute. 665 F.2d at 144. For purposes of this appeal, we fail to see how the subtle distinction between the automatic lapse of mineral property in *Texaco* and the discretionary determination of uninhabitability in the instant case, is of any consequence. By declaring a dwelling uninhabitable, and issuing an order to temporarily vacate, the City of Milwaukee is simply performing its regulatory duty to protect the health, safety, morals, and general welfare of the public. The City's determination of unhabitability is by no means final and binding upon tenants, rather it is an administrative determination that initiates a hearing process, including an appeal before the Building Maintenance Code Enforcement and Appeals Board, and eventually through the state court system. *See* sections 12–11(3), (5), Milwaukee Code of Ordinances (at the time in question, embodied in section 51–3(3), Milwaukee Code of Ordinances). In addition, Wis.Stat. § 66.-05(3) provides that "anyone affected" by the City's order to vacate a dwelling, may apply for a restraining order in circuit court, and thereby allow the court, within twenty days, to determine the reasonableness of the City's order.

The Milwaukee housing code, therefore, allows tenants ordered by the City to temporarily vacate their dwelling, to have the order reviewed by the Building Maintenance Code Enforcement and Appeals Board and the state court system. This procedure of judicial review is similar to that in *Texaco* where the owner of lapsed mineral property was entitled to "a subsequent judicial determination that a particular lapse did occur." 454 U.S. at 535, 102 S.Ct. at 795.[9] Though Milwaukee's housing

code, by allowing the building inspector to make a discretionary determination that a dwelling is uninhabitable, differs from the Mineral Lapse Act in *Texaco,* where mineral property automatically lapses upon twenty years of non-use, both determinations are subject to judicial review. In *Texaco* the owner of mineral property, whose property interest has lapsed, is entitled to a judicial determination that the property interest has, in fact, reverted to the surface owner. In the instant case, the tenant ordered to temporarily vacate an uninhabitable dwelling is entitled not only to a hearing before the Building Maintenance Code Enforcement and Appeals Board but also to a judicial determination that the City's order to temporarily vacate is valid. Thus, the City of Milwaukee's initial determination of uninhabitability and the State of Indiana's statutory lapse of a mineral interest are neither final nor binding upon the affected parties and, in effect, serve as nothing more than a starting point for a hearing process that culminates in a full judicial inquiry into the matter. Furthermore, the Mineral Lapse Act conditions ownership of mineral property upon the condition that the mineral property be "used" and the Milwaukee housing code conditions possession of the leasehold interest upon the condition that the leasehold remain fit for human habitation. In the final analysis, both statutes place a reasonable condition upon a property right created by the state and allow anyone affected by the failure of that condition to contest the validity of the failure in court.

Based upon the foregoing analysis, we conclude that the United States Supreme Court's holding in *Texaco,* that no taking occurs when, pursuant to a state regulation, a mineral interest lapses, is dispositive of the result in this instance. The State of Wisconsin has created a property interest

---

**9.** The United States Supreme Court, in discussing the notice to which affected mineral owners were entitled under the Mineral Lapse Act, stated:

"*It is undisputed that, before judgment could be entered in a quiet title action that would determine conclusively that a mineral*

*interest has reverted to the surface owner,* the full procedural protections of the Due Process Clause—including notice reasonably calculated to reach all interested parties and a prior opportunity to be heard—must be provided." (emphasis added).
*Texaco,* 454 U.S. at 534, 102 S.Ct. at 794.

for tenants (i.e., a possessory interest in the leasehold) which it conditions on the reasonable requirement that the leasehold remain fit for human habitation. The uninhabitability of the premises occurs through no fault of the state but rather through the inattention of the landlord and/or tenant. We conclude that, in furtherance of its duty to protect the health, safety, morals, and general welfare of the public, and in light of the United States Supreme Court's holding in *Texaco*, the City of Milwaukee's order to temporarily vacate an uninhabitable dwelling cannot legally or logically be construed to constitute a taking within the meaning of the Fifth Amendment.

Our determination is further supported by the United States Supreme Court's language in *Loretto*, where the Court held that the permanent affixation of a cable T.V. transformer box and wires to the exterior of a residential rental building constituted a "taking" of the owners' property. In so holding the Court stated:

> "Finally, we do not agree with the appellees that application of the physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships. *This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation to all economic injuries that such regulation entails. . . . Consequently, our holding today in no way alters the analysis governing the State's power to require landlords to comply with building codes. . . .*" (citations omitted) (emphasis added).

458 U.S. at 440, 102 S.Ct. at 798. Accordingly, we hold that in light of *Texaco* and *Loretto* this court's determination in *Devines I*, that the City of Milwaukee's order to vacate an uninhabitable dwelling constituted a public taking within the meaning of the Fifth Amendment was "clearly erroneous" as it was "contrary to the best interests of society and work[ed] a manifest injustice in the particular case." *United States v. Habig*, 474 F.2d at 60. By declaring a dwelling uninhabitable, and issuing an order to temporarily vacate, the City of Milwaukee is performing its regulatory duty to protect the health, safety, morals, and general welfare of the public. Considering "the character of the action and . . . the nature and extent of the interference with rights," *Penn Central Transportation Co. v. New York City*, 438 U.S. at 130–31, 98 S.Ct. at 2662–63 it is a manifest injustice and contrary to the best interests of society to penalize the City of Milwaukee for properly enforcing its building code, designed in part, to reduce the incidence of substandard housing. Upon reconsideration of our decision in *Devines I*, we hold that the City of Milwaukee's order to temporarily vacate an uninhabitable dwelling does not constitute a public taking within the meaning of the Fifth Amendment. Accordingly, we reverse the holding in *Devines I* that Devines, et al., are entitled to compensation under the Fifth Amendment and reinstate the district court's original finding that the City of Milwaukee's enforcement of its housing code does not entitle Devines, et al., to compensation under the Fifth Amendment.[10]

**B. WIS.STAT. § 32.19**

This court stated in *Devines I* that Wis. Stat. § 32.19 "merely implements the just compensation requirement . . . [and thus] our conclusion regarding the plaintiffs' Fifth Amendment claim is dispositive of the issue whether plaintiffs are entitled to compensation under Wis.Stat. § 32.19." 665 F.2d at 146. *See also Devines v. Maier*, 494 F.Supp. at 995. In light of our holding that the City of Milwaukee's order to temporarily vacate an uninhabitable dwelling does

**10.** This court reverses the holding in *Devines I* only on the issue that the City of Milwaukee's enforcement of its housing code was a regulatory taking of Devines, et al., leasehold rights for a public purpose, thereby entitling the class of plaintiffs to just compensation under the Fifth Amendment and Wis.Stat. § 32.19. Our decision in no way affects the holding in *Devines I* that Devines, et al., do not qualify for relocation benefits under the Uniform Relocation Act.

not constitute a public taking within the meaning of the Fifth Amendment, we do not reach the issue of compensation under Wis.Stat. § 32.19. Furthermore, we reverse the holding in *Devines I* that Devines, et al., are entitled to compensation under Wis.Stat. § 32.19 and reinstate the district court's original finding that Wis.Stat. § 32.-19 "is not applicable in these circumstances." *Devines v. Maier,* 494 F.Supp. at 995.

■ Finally, we note that following this court's mandate in *Devines I,* the district court, on July 23, 1983, awarded plaintiffs $35,000 in attorney's fees as "the prevailing party" under 42 U.S.C. § 1988. Though the issue of attorney's fees was preserved for appeal by the City of Milwaukee, the City gave only cursory treatment to the issue in its brief. Devines, et al., did not brief the issue of attorney's fees and neither party addressed the issue in its oral argument before this court. Accordingly, we remand this case to allow the district court to fully and adequately consider whether appellees, Devines, et al., were, in fact, a "prevailing party" in light of this court's decision.

### III.

Based upon the United States Supreme Court's intervening decisions in *Texaco, Inc. v. Short,* 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982) and *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), we reverse the district court's January 21, 1983 judgment on the issue of compensation under the Fifth Amendment and Wis.Stat. § 32.19 and hold that the City of Milwaukee's order to temporarily vacate an uninhabitable dwelling does not constitute a taking within the meaning of the Fifth Amendment. We remand this case to the district court on the limited issue of determining if attorney's fees are warranted under 42 U.S.C. § 1988.